Opinion issued July 12, 2007 





 














In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00426-CV

__________


NOBLE DRILLING (US) INC., NOBLE DRILLING (PAUL ROMANO)
INC., SHELL OFFSHORE, INC., AND SHELL DEEPWATER
DEVELOPMENT, INC., Appellants


V.


KELLY FOUNTAIN, Appellee






On Appeal from the 151st District Court

Harris County, Texas

Trial Court Cause No. 0304423






O P I N I O N

 Appellants, Noble Drilling (US) Inc. and Noble Drilling (Paul Romano) Inc.
(collectively, "Noble") and Shell Offshore, Inc. and Shell Deepwater Development,
Inc. (collectively, "Shell"), challenge the trial court's judgment, rendered after a jury
verdict, awarding appellee, Kelly Fountain, $1,345,900, in Fountain's suit against
appellants for negligence under the Jones Act (1) and general maritime law. In four
issues, appellants contend that there is no evidence or factually insufficient evidence
"of Jones Act negligence giving rise to Noble's alleged liability in connection with
injuries suffered by Fountain while performing a routine task" and "of general
maritime negligence as to Shell's conduct in regard to injuries sustained by Fountain
while performing a routine task." 

 We affirm the judgment rendered in favor of Fountain against Noble, but
reverse and render the judgment rendered in favor of Fountain against Shell. We
remand the case to the trial court for the entry of a new judgment consistent with this
opinion. 

Factual and Procedural Background


 Fountain sued Noble and Shell for bodily injuries that he sustained while
working for Noble as a roustabout on the NOBLE PAUL ROMANO, a drilling rig
located in the Gulf of Mexico. As a roustabout, Fountain's duties included helping
other crew members who were shorthanded, cleaning, and lifting. (2) Fountain asserted
Jones Act, unseaworthiness, and maintenance and cure claims against Noble and a
general maritime negligence claim against Shell, the operator of the well. 

 Fountain testified that, at the beginning of his shift on October 9, 2002, during
a "pre-tour meeting" conducted by his supervisor, Tim Spear, the rig's crane operator,
Fountain was assigned to serve as a flagger during the off-loading of a supply ship. 
Following the meeting, Fountain descended to the supply ship equipped with a
portable radio, permitting him to stay in communication with Spear during the off-loading procedure. Fountain explained that for "safety reasons" and to minimize
injuries, as well as for ease of use, all cargo loads on supply ships were required to
be pre-slung, arriving at the rig "already with the things you need to hook to the
crane." Furthermore, to prevent loads "from laying [sic] flat on the deck," making it
more difficult to maneuver the loads, all cargo loads were required to be placed on
dunnage. (3) 

 Fountain further testified that, despite these requirements, the last load on the
supply ship, "a big bundle of tubing," 20-feet long, was not pre-slung and was "flat
on the deck." Fountain noted that the load was "heavy" and two men together would
not have been able to lift and carry the load. Two riggers on the supply ship were
having difficulty handling this load and "tried to hook the crane up to [the load] by
lifting it and getting the slings under, but they couldn't do it by it being flat on the
deck." When Fountain radioed Spear and told him that the load was not pre-slung
and "laying [sic] flat on the deck," Spear told Fountain to "help." From where
Fountain was standing on the supply ship, he could see Spear, and nothing obstructed
Spear's view of him. 

 Fountain, who would not have lifted the load without Spear's instructions,
lifted the first side of the load, enabling one of the riggers to place the sling
underneath one side. Fountain then lifted the other side of the load, but the rigger
could not get the slings underneath the load until Fountain's third lift. During his
third lift, Fountain "felt a pop" in his lower back. Later that evening, after Fountain
had returned to the rig, he "couldn't move." Fountain's pain persisted, he was placed
on light duty, and he ultimately left the rig. Fountain later learned that he suffered a
herniated disc as a result of lifting the load.

 On cross-examination, Fountain agreed that, as part of his employment, he had
been trained "to lift things properly and safely." He was a certified rigger, who had
been taught "how to sling and unsling pieces of equipment," and he had previously
"rigged up" and "put slings" on loads. Although Shell, one week prior to the
incident, had enacted a formal pre-slinging policy that required all loads to be pre-slung, Fountain, prior to the policy, had been told not to handle loads that were not
pre-slung. Fountain also agreed that he was charged with telling Spear "exactly what
was going on" on the deck of the supply ship, but reiterated that Spear had "visual
sight" of him. When Fountain walked up to the load, he thought that he could lift it
and that it was within his "safe lifting capabilities." Fountain conceded that he had
"the absolute right to refuse to pick anything up." 

 Fountain confirmed that, prior to the enactment of the pre-slinging policy,
"there were times that [he] would have done the job exactly the same way as [it] was
done on the day of the incident." He admitted that he did not ask the riggers on the
supply ship to get additional riggers to help, did not tell Spear that he was having
trouble, and did not ask for a pry bar to assist with the lift. However, in Fountain's
opinion, a pry bar would not have been useful. Fountain maintained that he lifted the
load as he was told, stating "that's my job as a roustabout." In his deposition
testimony, Fountain had previously agreed that if he had contacted Spear and told him
that the load was too heavy to lift, Spear could have either sent additional help or
handled the load another way. Fountain also agreed that when he radioed Spear, he
did not discuss the load's weight.

 Spear, the crane operator on the rig, testified that, according to Shell policy, the
bundle of tubing, which he described as two tubes, 20 feet long, and "three by three"
inch, should have been pre-slung. From his position in the crane, roughly 160 feet
away, Spear could see the ship's deck, and it looked like the load was sitting flat on
the deck. Fountain, as he was required to do, radioed Spear before getting "physically
involved in the rig up," told Spear that the load was not pre-slung and was sitting flat
on the deck, and asked if he could "help them pick it up." Spear knew from this
request that Fountain would "be helping [the riggers] lift the tubing to put the slings
underneath." After Spear gave Fountain permission to assist, Spear saw Fountain
pick up the first end of the load and the riggers place the sling underneath. Fountain
then picked up the other side, the slings were placed underneath, and, using the crane,
Spear lifted the load to the rig. 

 Spear further testified that he should have reported the non-complying load to
the barge engineer, his direct supervisor, and that he failed to do so. Spear conceded
that he also had the ability to suspend unsafe operations. After learning of Fountain's
injury, Spear looked at the tubing, guessed it weighed 200 pounds, and then picked
up one end of the tubing by himself, but not to his waist. Although it was a "strain,"
Spear stated that roustabouts are trained on proper lifting techniques, and, as best he
could tell, Fountain properly lifted the load. 

 Spear conceded that he had trained Fountain that all loads were required to be
pre-slung. Despite the fact that the load was not slung, nothing seemed unsafe or
dangerous to Spear about Fountain's helping rig the load. When Fountain asked
Spear for permission to help the riggers with the load, Spear told Fountain, "If you
think you can handle it." Spear denied "ordering" Fountain to help, and stated that
he never ordered Fountain to do anything unsafe. Spear did not see Fountain have
any problems lifting the first end of the load, and, although his view was partially
blocked when Fountain lifted the second end, Spear did not see any problems or
difficulties. Spear explained that he could have provided Fountain additional help,
but Fountain never told Spear that he was having trouble or needed help, and Spear
did not refuse to provide additional help. Spear noted that when a load is too heavy
to be lifted by one man, it is possible to use a pry bar for leverage. Spear also noted
that prior to the pre-slinging policy, roustabouts performed rigging work on cargo
when it arrived on the rig. 

 Lonnie Neitermayer, appellants' corporate representative, testified that Spear,
as crane operator, was in a supervisor position and that the safety of his crew was his
responsibility. During Neitermayer's testimony, Fountain introduced into evidence
a copy of the "operations procedure for offshore crane operations" in effect at the
time of the incident. The procedures established the "requirements for the pre-slinging and containerization of loads being transported" from vessels to Shell
locations. Neitermayer explained that, pursuant to this policy, all loads were required
to be pre-slung, with no variances or exceptions. Also, Noble was contractually
bound to honor Shell's policies, and Shell had a "company man" on the rig to ensure
that Shell's "safety policies and procedures [were] followed." Moreover, a Shell
representative visited the supply ship with the manifest prior to its departure for the
rig, went through and photographed "everything . . . located on the deck," and
authorized the supply ship to depart for the rig. 

 Neitermayer further testified that once Fountain notified Spear of the non-complying load, Spear was required to notify his supervisor, the barge engineer, and
that the "only legitimate thing" for Spear to do was to reject the load because it was
not pre-slung and was not on dunnage. In fact, the policy was in place in light of
injuries that could result from lifting loads. Neitermayer stated that from the
manifest, he could not determine the weight of the bundle.

 Brandon Leblanc, one of the two riggers on the supply ship involved in the off-loading process, testified that Fountain, acting as a flagger on the day of the incident,
did not have the responsibility to perform rigging. Leblanc denied asking Fountain
for assistance or having problems with rigging the loads. Although there were
"plenty of people" on the ship who could have assisted, Fountain just "went and
grabbed the load" so that he and the other rigger could put the slings on the load.
Leblanc described the load as two pieces of 15-20 foot section of square tubing,
maybe 2-3 inches around, bundled by some rope, weighing approximately 150
pounds. Leblanc noted that flagman do not normally get involved in the rigging
process because "they're not supposed to."

 Leblanc further stated that he and the other rigger on the supply ship had
previously lifted and moved the load to the rear deck so that the crane could reach it,
it "wasn't that difficult" to lift, and he "wouldn't even have considered it a lift." Prior
to the ship's departure for the rig, Leblanc and another rigger had picked up the
tubing with no problem and carried it approximately fifty feet so that it could be
secured on the deck for the voyage. Leblanc thought there was nothing unsafe about
the manner in which Fountain lifted the load. 

 Curtis Little, captain of the supply ship, testified that Shell required his
employer, a third party who owned and operated the supply ship, to have certified
riggers to handle the cargo. Shell is responsible for generating the cargo manifest for
the ship, checking the cargo against the manifest and photographing it from overhead,
walking the deck and checking off the cargo, and telling him whether "everything is
present and accounted for" and "looks good and safe." Little explained that Shell,
prior to a ship's departure, has the opportunity to determine that something is not safe
or that something needs to be pre-slung.

 Jameson, Noble's Offshore Installation Manager, testified that Spear had told
him that Fountain had requested permission to assist the riggers because they were
having trouble getting the slings under the load. 

 Bernard Price, appellants' expert witness, testified that although Shell's
offshore and rigging policy is based on the American Petroleum Institute's ("API")
recommended practice, the policy far exceeds and is much more stringent than the
API recommended practice. Price explained that it is "quite normal" for a crane
operator like Spear to take advice from his flagman and that Fountain was doing the
work "he would normally be expected to do" as a roustabout. Price stated that,
generally, it is the normal practice in the industry to pre-sling those loads that are very
heavy or of an unusual shape, but Shell required that everything be pre-slung to go
"the extra mile" and to make it "safer" and "quicker."

 At the conclusion of trial, the jury found that the negligence, among others, of
Noble, Shell, and Fountain caused Fountain's injuries, and allocated 83% of the
negligence to Noble, 2% of the negligence to Shell, and 1% of the negligence to
Fountain. (4) The jury further found that Fountain "was acting under specific orders
at the time of the incident." The jury awarded Fountain compensatory damages for
pain and suffering, mental anguish, lost income, impairment of earnings capacity, and
medical expenses. Based on the jury's findings, the trial court awarded Fountain
$1,345,900. (5) Jones Act

 In their first and third issues, appellants argue that there is no evidence or
factually insufficient evidence "of Jones Act negligence giving rise to Noble's alleged
liability" to Fountain because he was injured while performing a routine task that was
neither "unreasonably dangerous nor did it subject [him] to an unreasonable risk of
harm." Appellants assert that Fountain based his "entire case" on "a self-imposed
policy promulgated by Shell" and, absent this policy, which had been adopted by only
two operators in the Gulf, the load would have been rigged on the ship's deck and
there would have been no basis for this lawsuit. Appellants also assert that Fountain
"had the absolute right to refuse to pick up the load," Spear had no knowledge of the
weight of the load, and, although Fountain was in a better position "to recognize a
risk of harm," Fountain never asked for help. 

 The Jones Act provides a cause of action for maritime workers injured by an
employer's negligence. (6) Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 405-06 (Tex.
1998); Diamond Offshore Mgmt. Co. v. Horton, 193 S.W.3d 76, 78 (Tex.
App.--Houston [1st Dist.] 2006, pet. denied). A fundamental duty of a Jones Act
employer is to provide its seaman employees with a reasonably safe place to work. 
See Colburn v. Bunge Towing, Inc., 883 F.2d 372, 374 (5th Cir. 1989). A Jones Act
claim is an in personam action for a seaman who suffers injury in the course of
employment due to negligence of his employer, the vessel owner, or crew members.
Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 441, 121 S. Ct. 993, 997 (2001). 
Ordinary prudence under the circumstances is the proper standard to be applied in
determining the duty of care owed by an employer or by seaman. Offshore Pipelines,
Inc. v. Schooley, 984 S.W.2d 654, 658 (Tex. App.--Houston [1st Dist.] 1998, no pet.)
(citing Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335, 339 (5th Cir. 1997)).
The circumstances of a seaman's employment include not only his reliance on his
employer to provide a safe work environment but also his own experience, training,
or education. Gautreaux, 107 F.3d at 339. Thus, the reasonable person standard
applies, and the standard in a Jones Act negligence action "becomes one of the
reasonable seaman in like circumstances." Id. 

 Under the Jones Act, a seaman is entitled to recovery if his employer's
negligence is the cause, in whole or in part, of his injury. (7) Gautreaux, 107 F.3d at
335; see also Rogers v. Mo. Pac. R.R., 352 U.S. 500, 506, 77 S. Ct. 443, 448 (1957)
(noting that under Federal Employers' Liability Act (FELA), causation burden is not
common law proximate cause standard, but rather "whether the proofs justify with
reason the conclusion that employer negligence played any part, even the slightest,
in producing the injury or death for which damages are sought"). The burden to
establish causation under the Jones Act has been termed "featherweight." See Horton,
193 S.W.3d at 79. However, liability arises only upon a showing of negligence, not
the fact that an injury occurred. Britton v. U.S.S. Great Lakes Fleet, Inc., 302 F.3d
812, 817 (8th Cir. 2002) (citing Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 543,
114 S. Ct. 2396, 2404 (1994)). Furthermore, a seaman's contributory negligence
"does not bar recovery, but diminishes damages on the basis of comparative
negligence in proportion to the amount of negligence attributable to contributory
fault." Broussard v. Stolt Offshore, Inc., 467 F. Supp. 2d 668, 670 (E.D. La. 2006). 
Thus, a seaman who is injured entirely by his own negligence cannot recover under
the Jones Act. Malefant v. Beatty St. Props., Inc., 328 F. Supp. 2d 668, 670 (S.D.
Tex. 2004). (8)

 Additionally, under the pertinent standard of review in a Jones Act case, the
jury is vested with complete discretion on factual issues about liability. Ellis, 971
S.W.2d at 406; Horton, 193 S.W.3d at 79. Once an appellate court determines that
some evidence about which reasonable minds could differ supports a verdict, the
appellate court's review is complete. Horton, 193 S.W.3d at 78. Essentially, we may
not conduct a traditional factual sufficiency review of a jury's liability finding under
the Texas "weight and preponderance" standard. Id. 

 We note that much of Fountain's evidence relates to the pre-slinging and
dunnage policy violations. For example, Fountain stated that these policies were
enacted for "safety reasons" and to minimize injuries in maneuvering loads.
Neitermayer agreed that there were no variances or exceptions to the slinging policy
applicable to this load. Also, Andrew Mclean, the "technical authority for hoisting
and lifting in [Shell's] maintenance integrity department," stated that the slinging
policy eliminated the obvious hazards in manually lifting a load. Appellants contend
that a violation of a company policy does not necessarily establish the violation of a
legal duty giving rise to a claim for negligence; however, such a violation can be a
relevant consideration in determining an employer's negligence. Regardless, contrary
to appellants' assertion, Fountain's evidence was not limited solely to violations of
these policies. 

 Here, Fountain presented evidence that two riggers on the supply ship were
having difficulty handling the load, which was not pre-slung and was "flat on the
deck." Consequently, Fountain radioed Spear, who had an unobstructed view of the
deck, and informed him of the non-complying load and the difficulty the riggers were
having with the load. Spear then, according to Fountain, instructed Fountain to
"help." Although Fountain agreed that he and Spear did not discuss the weight of the
load, Jameson, Noble's Offshore Installation Manager, testified that Spear had told
him that Fountain had told Spear that the riggers were having difficulty with it. 
Fountain did agree that he initially felt that the load was within his "safe lifting
capabilities" and that he had the right to refuse to lift the load, but he explained that
he was simply doing what he was told to do by Spear. 

 In regard to the weight of the load, Fountain described the load as heavy,
denied that two men could carry the load, and felt that by ordering him to lift the load,
Spear had ordered him to perform an unsafe task. On the other hand, Leblanc, one
of the ship's riggers, testified that he and another rigger had previously lifted the load
without difficulty. Although Spear's testimony regarding the weight of the load was
unclear, he did state that lifting it caused a "strain." Nevertheless, the other evidence
generally showed that the load weighed approximately 150-200 pounds. Finally,
notwithstanding Shell's policy, Andrew Mclean, a Shell employee, opined that pre-slinging was a "common practice" or "best practice" "in a number of areas of the
world in offshore operations and cargo handling."

 Appellants assert, without citation to any record evidence, that "[t]his is not a
case where Fountain was asked or ordered to pick up something that was too heavy
for him to lift." However, a review of the conflicting evidence, as outlined above,
reveals that this is precisely the issue that the jury was asked to resolve. Even though
Fountain agreed that, as a roustabout, his general duties included lifting, and
appellants presented conflicting evidence on the controlling issues of the weight and
configuration of the load and the reasonableness and scope of Spear's instruction to
lift it, Fountain did present some evidence to support the jury's finding under the
Jones Act that Noble failed to provide Fountain a reasonably safe place to work. See
Bommarito v. Penrod Drilling Corp., 929 F.2d 186, 188 (5th Cir. 1991) (affirming
negligence finding under Jones Act in favor of plaintiff who was injured after fellow
employee who, as a result of the employee's pre-existing injury, shifted
disproportionate amount of weight onto plaintiff while plaintiff and employee were
lifting equipment); Broussard, 467 F. Supp. 2d at 674 (finding that employee failed
to act with ordinary prudence by using unsafe method to lift fuel transfer hose);
Agbayani v. Cal Dive Int'l, Inc., No. 05-0881, 2006 WL 3230302, at *4 (W.D. La.
2006) (finding repeated instruction from operator to lift heavy object that plaintiff
could not "budge" raised fact issue on claim that employer breached obligation to
provide safe place to work); see also Britton, 302 F.3d at 817-18 (concluding that
employee raised fact issue on Jones Act negligence claim with evidence that back
injury was caused by shortage of deck hands that resulted in work too strenuous for
one man). 

 Accordingly, we hold that there is legally sufficient evidence to support the
jury's finding of negligence against Noble under the Jones Act. See Ellis, 971
S.W.2d at 406; see also Gautreaux v. Ins. Co. of N. Am., 811 F.2d 908, 913 (5th Cir.
1987) ("It is within the jury's province to weigh conflicting testimony, and as long
as there is evidence supporting the verdict, it will be upheld.").

 We note that appellants' evidentiary complaints generally focus on Fountain's
alleged contributory negligence. See Broussard, 467 F. Supp. 2d at 674 (finding that
seaman had obligation to tell fellow employee to stop lifting hose in unsafe fashion
once seaman perceived lift to be unsafe, and assigning 40% contributory fault to
seaman). For example, appellants presented some evidence that Fountain failed to
request additional help, failed to use the proper equipment, and failed to notify Spear
that he was having trouble with the lift. The jury heard this evidence, and it was
entitled to consider this evidence in apportioning negligence against Fountain. See
id. Given the pertinent standard of review, we cannot conclude that the jury's
findings of negligence against appellants are based on insufficient evidence.

 Appellants also assert that the evidence of negligence is insufficient because
Fountain failed to present expert witness testimony on the standard of care owed to
Fountain during the off-loading operation. However, such expert testimony is not
required in this context. See Peters v. Five Star Marine Serv., 898 F.2d 448, 450 (5th
Cir. 1990) (holding jury, using only their common experience and knowledge, could
adeptly assess whether it was reasonable for employer to instruct his employee to
move equipment on deck of boat during heavy seas and whether employer improperly
stowed cargo). 

 Finally, appellants rely on Harrison v. Seariver Maritime, 61 Fed. App'x 119,
No. 02-40307, 2003 WL 342266 (5th Cir. 2003), in support of their argument that
because picking up objects is a "routine, ordinary task" for roustabouts and
deckhands, there is no evidence that "this practice is negligent." However, Harrison
is substantively distinguishable. In Harrison, a ship employee alleged that she
injured her knees while moving hoses about the ship. Id. at *3. Noting that an
employer "is not an insurer of a seaman's safety," the United States Court of Appeals
for the Fifth Circuit held that the employer did not violate its duty to exercise
reasonable care with respect to workplace safety and that the trial court's Jones Act
negligence finding was clearly erroneous. Id. at *4. The court's holding was based,
in part, on the fact that the assigned task "was routine and certainly not hazardous;
moving shipboard equipment is a common and expected physical task [, and]
[o]rdinary prudence is exercised when a safe procedure is used for a routine task,
even when a safer procedure might exist." Id. at *5 (citations omitted). The court
noted that although the plaintiff's proffered method of lowering the hoses would have
been safer, there was no evidence that the method actually used was unsafe. Id. The
court further noted that there was no evidence that the manpower assigned to the task
was inadequate or that the job was too difficult or complicated. Id. at *6. 

 Here, in contrast, in addition to the evidence of a policy violation, Fountain
presented evidence that he was assigned the task of lifting an object that was too
heavy, was not slung, and was not on dunnage after he informed his supervisor that
two riggers on the supply ship were having difficulty with the load. Although Spear
contended that he permitted Fountain to get involved only if he thought he could
handle it, Fountain presented some evidence that would support the jury's finding that
the instruction to become involved in this lift, under the circumstances, was unsafe.

 We overrule appellants' first and third issues. 

General Maritime Negligence

 In their second and fourth issues, appellants argue that there is no evidence or
factually insufficient evidence "of general maritime negligence as to Shell's conduct"
in regard to Fountain's injuries because he was injured while performing a routine
task that was neither "unreasonably dangerous" nor did it subject him to "an
unreasonable risk of harm." Appellants assert that although Shell had a company man
aboard the rig, there is no evidence that "he knew or should have known of the
situation" and there is no evidence that any Shell personnel were present when
Fountain and Spear discussed the non-complying load. Appellants argue that the
evidence actually shows that they complied with the slinging policy because the
tubing was loaded on the ship by a crane using slings. In sum, Shell asserts that the
only evidence pertaining to Shell was that it promulgated a slinging policy to which
its contractors were required to adhere.

 The parties agree that Fountain's claim against Shell is governed by general
maritime law. The standard of review for claims arising under general maritime law
is the so-called "reasonable minds" standard. Fontenot v. Teledyne Movible Offshore,
Inc., 714 F.2d 17, 19 (5th Cir. 1983) (citing Comeaux v. T.L. James & Co., 666 F.2d
294, 298 (5th Cir.1982)). This standard requires appellate courts to judge in light of
all the evidence whether "'reasonable men could not arrive at a contrary verdict' to
that urged by the movant." Fontenot, 714 F.2d at 19 (citing Boeing Co. v. Shipman,
411 F.2d 365, 374 (5th Cir. 1969) (en banc), overruled on other grounds by
Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir. 1997) (en banc)). A mere
scintilla of evidence is insufficient to present a question for the jury. Boeing Co., 411
F.2d at 374. Rather, there must be a conflict in substantial evidence to create a jury
question. Id. at 375. However, it is the function of the jury as the traditional finder
of the facts, and not the Court, to weigh conflicting evidence and inferences, and
determine the credibility of witnesses. Id.

 To prevail on a negligence claim brought under general maritime law, a
plaintiff must establish (1) the existence of a duty owed by the shipowner or operator,
(2) a breach of that duty, (3) proximate cause, and (4) injury and damages. (9) 
Champagne v. Tetra Applied Techs., Inc., No. Civ. A. G-05-299, 2005 WL 3478171,
at *3 (S.D. Tex. Dec. 20, 2005) (citing Thomas J. Schoenbaum, Admiralty &
Maritime Law § 5-5 (4th ed. 2004)); see also Johnson v. Offshore Express, Inc., 845
F.2d 1347, 1354 (5th Cir. 1988) (general maritime law requires proof of proximate
cause). General maritime law imposes "a general burden of reasonable care." See
River Transp. Assocs. v. Wall, 5 F.3d 97, 100 (5th Cir. 1993); see Smith v. S. Gulf
Marine Co. No. 2, Inc., 791 F.2d 416, 421 (5th Cir. 1986) ("[A] shipowner owes to
passengers the duty of exercising 'reasonable care under the circumstances of each
case.'") (quoting Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625,
632, 79 S. Ct. 906, 959 (1959)).

 In support of the negligence findings against Shell, Fountain cites evidence
that, according to him, establishes that a "Shell representative knew or should have
known that the bundle . . . was not pre-slung at the time" the ship departed for the rig. 
Fountain primarily relies on the testimony of Curtis Little, the captain of the supply
ship, who testified that Shell generated the cargo manifest for the ship, checked the
cargo against the manifest "right there at departure time," and told him that
"everything [was] present and accounted for" and "look[ed] good and safe." Fountain
also refers to Neitermayer's testimony that Shell violated its own policy if its
representative authorized the ship to go to the rig with the non-complying load.

 We conclude that this evidence would not have enabled reasonable jurors to
find Shell negligent. Even assuming that the evidence would have permitted a
finding that Shell was aware that the load was not pre-slung at the time of the ship's
departure, this evidence at most would permit a finding that Shell was aware of a
policy violation, not that it breached any duty that it owed to Fountain or that any
breach of a duty by Shell caused Fountain's injuries. 

 As Fountain made clear at trial, and as he emphasizes in his briefing to this
Court, the findings of negligence against Noble under the Jones Act are supported not
merely by the simple fact that Noble and Shell violated the pre-slinging and dunnage
policies, but rather by Noble's conduct once Fountain encountered the non-complying
load when he was aboard the supply ship. However, Fountain did not present any
evidence that Shell supervised or was responsible for controlling the specific off-loading procedures in which Fountain participated. Moreover, Fountain has not made
any showing or argument that Shell is legally responsible for Noble's conduct due to
their business relationship. Accordingly, we hold that the evidence is legally and
factually insufficient to support the findings of negligence against Shell under general
maritime law.

 We sustain appellants' second and fourth issues.









Conclusion


 We affirm the judgment of the trial court rendered against Noble, reverse the
judgment rendered against Shell, and render judgment that Fountain take nothing on
its claim against Shell. We remand the case to the trial court for the entry of a new
judgment consistent with this opinion.



 Terry Jennings

 Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.
1. See 46 U.S.C. § 688 (2000).
2. Citing to Noble's "Core competency model" for roustabouts, appellants assert in their
brief that "[u]nquestionably, lifting and moving heavy objects was a routine part of
[Fountain's] job." This document states that roustabouts are "[r]esponsible for
rigging and moving of equipment and materials."
3. "Dunnage" is defined as "[p]ieces of wood, matting, or similar material used to keep
a cargo in position in a ship's hold." The New Oxford American Dictionary 529
(2001).
4. The jury assigned 14% of the negligence to a defendant who is not a party to this
appeal.
5. The jury also found that the rig was not unseaworthy at the time of the incident, and
the parties settled Fountain's cure claim. Appellants do not challenge the amount of
the damages awarded to Fountain. 
6. Federal law provides that a party asserting an admiralty action may bring the action
in state court. See 28 U.S.C. § 1333(1) (2000). When a state court hears an admiralty
case, the state court must apply substantive federal maritime law, but follow state
procedure. See Texaco Ref. & Mktg., Inc. v. Estate of Dau Van Tran, 808 S.W.2d 61,
64 (Tex. 1991).
7. A seaman who suffers personal injury during the course of his employment is entitled
to the rights and remedies available to railway employees. See 46 U.S.C. § 688(a)
(2000). Thus, the cited railway cases apply to our analysis. See Brown v. Parker
Drilling Offshore Corp., 410 F.3d 166, 178 (5th Cir. 2005) ("Jones Act cases follow
cases under the FELA" [Federal Employer's Liability Act].). 
8. Here, the jury was instructed, in regard to negligence under the Jones Act, that,


 Negligence is the doing of an act that a reasonably prudent person would not
do, or the failure to do something that a reasonably prudent person would do,
under the same or similar circumstances. The occurrence of an accident,
standing alone, does not mean anyone's negligence caused the accident. In a
Jones Act claim, the word 'negligence' is given a liberal interpretation. It
includes any breach of duty that an employer owes to his employees who are
seamen, including the duty of providing for the safety of the crew. . . .
Negligence under the Jones Act may consist of a failure to comply with a duty
required by law. Employers of seamen have a duty to provide their employees
with a reasonably safe place to work. If you find that [Fountain] was injured
because Noble failed to furnish him with a reasonably safe place to work, and
that [Fountain's] working conditions could have been made safe through the
exercise of reasonable care, then you must find that Noble was negligent. The
fact that Noble conducted its operations in a manner similar to that of other
companies is not conclusive as to whether Noble was negligent or not. You
must determine if the operations in question [were] reasonably safe under the
circumstances . . . . 


 Neither party complains about the above instructions, which were based, in large part,
on the Fifth Circuit Pattern Jury Instructions. See Fifth Circuit Pattern Jury
Instructions Civil (2004).
9. Here, the jury was instructed,


 Negligence under the general maritime law is the doing of an act that a
reasonably prudent person would not do, or the failure to do something that a
reasonably prudent person would do, under the same or similar circumstances. 
The occurrence of an accident, standing alone, does not mean anyone's
negligence caused the accident.


 The parties did not complain about this instruction.