Opinion issued March 2, 2006



     











In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00438-CV




DIAMOND OFFSHORE MANAGEMENT COMPANY, Appellant

V.

LAMAR HORTON, Appellee




On Appeal from the 190th District Court
Harris County, Texas
Trial Court Cause No. 2002-22966




O P I N I O N

          In this personal injury suit for negligence, unseaworthiness, and maintenance
and cure under the Jones Act,


 appellant, Diamond Offshore Management Company
(Diamond), appeals from a jury verdict awarding damages to appellee, Lamar Horton. 
In two issues on appeal, Diamond asserts that the evidence is factually insufficient
to support the jury’s finding (1) that Horton’s injury was causally connected to and
resulted from Horton’s arm injury and (2) on comparative fault, which assessed 90%
of responsibility to Diamond and only 10% to Horton. 
          We affirm.
Background
          Diamond’s employee, Horton, worked as a deck coordinator


 on an offshore
drilling vessel, the Ocean Spur. At the end of October 2001, Horton and Jerry Neal,
a crane operator, were attempting to move pipes in a cargo basket from one level of
the Ocean Spur to a higher level, when one of the pipes, or stabilizers, suddenly
struck Horton on his right arm.


 Horton initially complained of an arm injury, but a
few months after the accident, Horton consulted Dr. Bradley Bartholomew, who later
testified that the accident also caused a herniated disc in Horton’s back. 
          A jury found that both parties’ negligence caused Horton’s injuries.


 The jury
attributed 10% of negligence to Horton, with the remaining 90% to Diamond and
awarded $737,664 in actual damages. In accordance with the jury’s apportionment
of negligence, the trial court awarded Horton $663,906.60 and post-judgment interest. 
Diamond filed a “Motion For New Trial, Or In The Alternative, Motion for
Remittitur.” The trial court denied Diamond’s motion for new trial, and this appeal
ensued. 
Jones Act
          In its first issue on appeal, Diamond argues that the evidence is factually
insufficient to support the jury’s finding of negligence because there was no causal
connection between the accident to Horton’s arm and his back injury.
          The Jones Act provides a cause of action for maritime workers injured by an
employer’s negligence. Federal law provides that a party asserting an admiralty
action may bring the action in state court. See 28 U.S.C. § 1333(1) (2000). When a
state court hears an admiralty case, that court occupies essentially the same position
occupied by a federal court sitting in diversity: the state court must apply substantive
federal maritime law but follow state procedure. See Texaco Ref. & Mktg., Inc. v.
Estate of Dau Van Tran, 808 S.W.2d 61, 64 (Tex. 1991); see also General Chem.
Corp. v. De La Lastra, 852 S.W.2d 916, 920 (Tex. 1993).
          Under the Federal Employers’ Liability Act (FELA), a related statute, the
causation burden is not the common law proximate cause standard. Rather, the
causation burden is “whether the proofs justify with reason the conclusion that
employer negligence played any part, even the slightest, in producing the injury or
death for which damages are sought.” Rogers v. Missouri Pac. R.R., 352 U.S. 500,
506, 77 S. Ct. 443, 448 (1957); Landry v. Oceanic Contractors Inc., 731 F.2d 299,
302 (5th Cir. 1984). This burden has been termed “featherweight.” See Johnson v.
Offshore Exp., Inc., 845 F.2d 1347, 1352 (5th Cir. 1988); Smith v. Trans-World
Drilling Co., 772 F.2d 157, 162 (5th Cir. 1985). The Jones Act expressly
incorporates FELA and the case law developing that statute. See Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex. 1998). Thus, the causation standard under
the Jones Act is the same as that under FELA. Id.; see also American Dredging Co.
v. Miller, 510 U.S. 443, 456, 114 S. Ct. 981, 989–90 (1994); see also Brown & Root,
Inc. v. Wade, 510 S.W.2d 408, 410 (Tex. Civ. App.—Houston [14th Dist.] 1974, writ
ref’d n.r.e.).
          Jones Act Liability
          Texas courts have long recognized that in addition to a less stringent burden
of proof, the standard of appellate review in a Jones Act case is also less stringent
than under the common law. See Texas & Pac. Ry. v. Roberts, 481 S.W.2d 798, 800
(Tex. 1972); Brown & Root, 510 S.W.2d at 410. As with the law on causation,
FELA’s standard of appellate review applies in Jones Act cases. Maritime Overseas,
971 S.W.2d at 406. Thus, the purpose of the Jones Act standard of review is to vest
the jury with complete discretion on factual issues about liability. Id. Once the
appellate court determines that some evidence about which reasonable minds could
differ supports the verdict, the appellate court’s review is complete. See Roberts, 481
S.W.2d at 800 (citing Lavender v. Kurn, 327 U.S. 645, 66 S. Ct. 740 (1946)). 
Essentially, we may not conduct a traditional factual sufficiency review of a jury’s
liability finding under the Texas “weight and preponderance” standard. Maritime
Overseas, 971 S.W.2d at 406 (citations omitted); see also Brown & Root, 510 S.W.2d
at 410. Rather, courts of appeals must apply the less stringent federal standard of
review. Maritime Overseas, 971 S.W.2d at 406.
          Diamond contends that the evidence is factually insufficient to support a causal
connection between Horton’s arm injury aboard the Ocean Spur and his back injury
because Dr. Bartholomew’s diagnosis was based solely on Horton’s self-diagnosis
complaint. To determine whether the evidence is factually sufficient, we review
Horton’s evidence of causation. 
          Horton testified that when he first started working for Diamond at the age of
28, he had to pass a physical examination that tested the strength of his back and
arms. Horton stated that he passed with no restrictions. Horton testified that, on the
day of the accident, he put pipes in the cargo basket and signaled someone


 to raise
the basket. Horton described the accident as follows:
          [Horton]      He got over, and I went to pushing it over to the end of the
basket. And before I get to the end of the basket, [Neal]
floor-boarded it. I didn’t hear him say he would come
down.
 
          [Counsel]    What do you mean he floor-boarded it?
          [Horton]      Well, he let down on the whip line. The whip line is fast,
that’s why they call it a whip line. He let it go and that
pipe, the stabilizer hit me and knocked me back. And then
it hit me and then it pinned me to the basket and it snapped
me in the basket a little bit. The basket was about four or
five feet high, you know. And it came about—right here
on me standing up. And I was pushing it and it knocked
me down and knocked me back. Then it kind of jerked me
in the basket a little bit and had me pinned. 

After getting up, Horton testified that he 
walked into the living quarters in the break room and lay down on
the bench. And my arm was dangling in the, you know, on the
floor. And I couldn’t feel myself for a minute, you know. My
whole body kind of went numb, because it hit so hard, you know,
I never been in that position. I played football, I got hit before,
and never like that. 

The next day, Horton left the rig after Diamond fired him. Horton testified that three
days after leaving the Ocean Spur, he visited an emergency room because 
[My] right arm is swollen up a little bit, and it was hurting. It was
throbbing and, I mean, it was swollen and, you know, I had a—I
was having pains up here, this shoulder just hurting, throbbing, I
mean. And it was swollen, I mean. You could see how big my
arm is, this one here was swollen about twice that size.

When asked whether his back hurt at that time, Horton responded, “My back at that
time, I thought it was my kidneys, but I really didn’t pay it no attention, because my
shoulder injury was killing me and that was more—that was my prime objective, you
know, getting this fixed.” 
          Horton’s medical records from a February 23, 2002 visit to an emergency room
indicate that he had pain in his back. In his medical records dated February 24, 2002,
Horton complained about arm, neck, and back pain. Horton testified that before the
accident he had had no physical problems with his back. Horton answered “no” when
asked if he had had any accidents after the accident aboard the Ocean Spur. 
          Dr. Bartholomew, a neurosurgeon, testified by deposition, and without
objection, that he first saw Horton on June 6, 2002. During this visit, Dr.
Bartholomew explained that he wanted to determine why Horton came to see him so
he asked him, as he asks his patients, “if your back’s hurting, when did it start, any
previous problems; and then I examine him and review any diagnostic studies.” In
taking Horton’s medical history, Dr. Bartholomew recalled that Horton told him that
he had been hit by a 400-pound stabilizer on the right arm and shoulder area and that
it pinned his right arm. When Dr. Bartholomew asked why Horton had waited so
long to visit an emergency room, Horton responded that he wanted to “tough it out,
as he’d already been told it was a sprain or strain and he thought it would get better.” 
Dr. Bartholomew said that Horton also complained of “back pain that started at the
same time.” Dr. Bartholomew testified that “[Horton] did tell me [the back pain] was
related to this same injury.” 
          Based on Horton’s examination and medical history, Dr. Bartholomew was
worried about a herniated disc or some other neck trauma. After Horton’s second
examination, Dr. Bartholomew recommended that Horton undergo an MRI, which
was conducted on November 5, 2002. Based on the results of the MRI, Dr.
Bartholomew testified that one of the discs (L4/5) in Horton’s back looked different
from the others. He explained that the disc was black, 
[W]hich means it’s lost some of its water content, and that can be
from really one or two things. One is we all lose water content as
we get older, so if he was 60 years old, I’d look at this and I’d
expect pretty much all of these to have—look darker, but I mean
he was 28, so there’s no reason, absent trauma, for this disc to be
dark from loss of water content. 

          Dr. Bartholomew further testified, 
Also something that makes me believe it’s more likely trauma
than degenerative changes, all the other discs look completely
normal. They’re all bright white, and also the fact that this disc
is pushing back, like that little mushroom cap I showed you, can
be a source of irritation to the nerve, causing pain going down the
leg. 

          When asked if he would consider it normal for a person at Horton’s age to have
a herniated disc absent a traumatic injury, Dr. Bartholomew answered, “No.” Dr.
Bartholomew was also asked, “[I]t’s your belief that Lamar needs that [back]
procedure as a result of the injury he sustained at work in November 2001?” Dr.
Bartholomew responded, “Based on his complaints of pain; yes, sir.” When asked if
he thought it was fair to say that based on everything he had seen, Dr. Bartholomew’s
opinion that Horton’s back condition was related to his work injury, Dr. Bartholomew
answered that his back condition was related to his work injury. 
          On cross-examination, Dr. Bartholomew admitted that someone could get a
ruptured disc in many different ways. When asked whether Horton’s statements were
the only things that tied Horton’s back pain to the injury at the jobsite, Dr.
Bartholomew stated that he had to “rely on his history of him having no previous
back problems, and then saying that this is what I associate the beginning of my back
pain with.” Horton told Dr. Bartholomew that he had no history of trauma to his
back, other than the accident aboard the Ocean Spur. Dr. Bartholomew stated that the
MRI does not show how a patient was injured and that one must rely on what the
patient says. Dr. Bartholomew stated that when Horton came to see him, Horton
stated that his arm and neck were hurting initially and that his back began to hurt
shortly after the accident.
          Justin Upton, a roughneck working on the Ocean Spur, testified by deposition
that the pipe that hit Horton was approximately five inches in diameter and three to
four feet in length. Neal testified that the pipe weighed approximately 200 pounds,
but other evidence indicated that it weighed 400 pounds. 
          We review Horton’s evidence of causation under the Jones Act standard of
review—whether some evidence about which reasonable minds could differ supports
the verdict. See Maritime Overseas, 971 S.W.2d at 406. The jury heard evidence that
Horton was hit with a pipe that weighed approximately 200 pounds or more. The
blow from the pipe pushed him back and pinned him between the pipe and the basket
holding the pipes. The jury also heard Horton testify that he had passed a physical
examination that tested his back before starting work for Diamond and that he had not
had any subsequent accidents or back injuries since leaving Diamond. The jury heard
Dr. Bartholomew’s expert testimony that the MRI of Horton’s back showed that his
injury appeared to have been caused by some type of trauma and that, in Dr.
Bartholomew’s opinion, Horton’s herniated disc was caused by his accident aboard
the Ocean Spur. After considering this evidence, we conclude that Horton presented
some evidence that supports the verdict. Stated another way, Horton’s evidence,
although circumstantial, satisfies the “featherweight” burden of proof—that
Diamond’s negligence played a part, albeit slight, in producing Horton’s injury.



          Although Diamond contends that Dr. Bartholomew’s testimony of causation
was not probative because it was based solely on Horton’s claims that his back began
to hurt shortly after the accident, the testimony shows that Dr. Bartholomew’s opinion
was also based on the results of the MRI. Specifically, Dr. Bartholomew testified that
Horton’s MRI indicated that some type of trauma had occurred. We also note that Dr.
Bartholomew’s testimony that the accident aboard the Ocean Spur caused Horton’s
back injury was not necessary for the jury to find Diamond liable. See Angelina Cas.
Co. v. Spencer, 310 S.W.2d 682, 685 (Tex. Civ. App.—Beaumont 1958, writ ref’d
n.r.e.) (holding that expert testimony needed only insofar as subject matter requires
scientific interpretation); Pilgrim’s Pride Corp. v. Smoak, 134 S.W.3d 880, 894 (Tex.
App.—Texarkana 2004, pet. denied) (“The trier of fact is usually allowed to decide
the issue of causation in cases when general experience and common sense will
enable a layperson to fairly determine the causal relationship between the event and
the condition.”). Indeed, the jury did not need expert testimony to determine that a
blow from a heavy pipe can play “any part, even the slightest, in producing” Horton’s
injury—a herniated disc. See Maritime Overseas, 971 S.W.2d at 406.
          Diamond points out that Dr. Bartholomew’s testimony did not reveal any
typical acts that could cause a ruptured disk and that he had no way of knowing
whether Horton’s injuries were caused by an intervening event subsequent to the
accident on the rig. A similar argument was asserted in Offshore Pipelines, Inc. v.
Schooley, 984 S.W.2d 654, 663–64 (Tex. App.—Houston [1st Dist.] 1998, no pet.),
to no avail. In Schooley, we stated that the plaintiff “was not required to disprove all
possible sources of the Yersinia bacteria other than the water on the [vessel].” Id. at
664 (citing Hernandez v. Altenberg, 904 S.W.2d 734, 739 (Tex. App.—San Antonio
1995, writ denied)). We conclude that whether Horton’s injury was caused by
another source was an issue for the jury to decide after considering all the evidence. 
See Offshore Pipelines, 984 S.W.2d at 663 (stating that “the jury enjoys complete
discretion in deciding factual issues on liability”). 
          Diamond further contends that the evidence of its experts negates the jury’s
finding of causation. Because we have found that the testimony of Horton and Dr.
Bartholomew sufficiently meets the Jones Act standard of review, the testimony of
Diamond’s experts is immaterial. See Maritime Overseas, 971 S.W.2d at 406 (“Once
the appellate court determines that some evidence about which reasonable minds
could differ supports the verdict, the appellate court’s review is complete.”). 
Moreover, “[i]t is within the jury’s province to weigh conflicting testimony, and as
long as there is evidence supporting the verdict, it will be upheld.” Gautreaux v. Ins.
Co. of N. Am., 811 F.2d 908, 913(5th Cir. 1987). We conclude that Horton presented
evidence in support of the verdict.
          We overrule Diamond’s first issue on appeal.
Percentage of Negligence
          In its second issue on appeal, Diamond argues that the evidence was factually
insufficient to support the jury’s apportionment of negligence. In question 1A, the
jury attributed 90% of the negligence to Diamond and 10% of the negligence to
Horton. The trial court entered judgment in accordance with the jury’s answers.
          Diamond admits that the record contains conflicting evidence about how the
accident occurred. Nonetheless, Diamond argues that even if Horton’s version of
events was believed by the jury, “no reasonable juror would allocate the bulk of the
negligence to Diamond, and only 10% to Horton.” 
          In a Jones Act case, the jury has complete discretion in resolving factual issues
on liability. Offshore Pipelines, 984 S.W.2d at 663. The jury was entitled to believe
that Horton was moving pipes in the cargo basket when Neal floor-boarded the basket
without warning, thus injuring Horton. Neal admitted that when lifts are being
performed, it is his responsibility to make sure they are done safely. Although Horton
was experienced, and the evidence indicated that Diamond constantly stresses that
employees should avoid getting in positions where they can get trapped between two
objects, we cannot conclude that the jury’s apportionment was unreasonable. 
Moreover, Diamond has not cited a single instance, and we find none, in which an
appellate court reversed the jury’s apportionment of negligence in a Jones Act case
and rendered a new percentage of negligence attributable to the parties, which is a
conclusion based on the jury’s weighing of the evidence.


 In light of the evidence
presented, we conclude that factually sufficient evidence supports the jury’s
apportionment of negligence.
          We overrule Diamond’s second issue on appeal.
Conclusion
          We affirm the judgment of the trial court.





                                                             Evelyn V. Keyes
                                                             Justice
 
Panel consists of Justices Nuchia, Keyes, and Hanks.