**NOBLE DRILLING (US) INC., Noble Drilling (Paul Romano) Inc., Shell Offshore, Inc., and Shell Deepwater Development, Inc., Appellants,**

v.

**Kelly FOUNTAIN, Appellee.**

**No. 01–06–00426–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

July 12, 2007.

Rehearing Overruled Sept. 27, 2007.

verdict, awarding appellee, Kelly Fountain, $1,345,900, in Fountain's suit against appellants for negligence under the Jones Act[1] and general maritime law. In four issues, appellants contend that there is no evidence or factually insufficient evidence "of Jones Act negligence giving rise to Noble's alleged liability in connection with injuries suffered by Fountain while performing a routine task" and "of general maritime negligence as to Shell's conduct in regard to injuries sustained by Fountain while performing a routine task."

We affirm the judgment rendered in favor of Fountain against Noble, but reverse and render the judgment rendered in favor of Fountain against Shell. We remand the case to the trial court for the entry of a new judgment consistent with this opinion.

Jeffrey R. Bale, Lewis E. Henderson, Roberts, Markel, & Bale P.C., Houston, TX, for Appellants.

John C. Schwambach Jr., John W. Stevenson Jr., Mark T. Murray, John Stevenson & Associates, P.C., Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

## OPINION

TERRY JENNINGS, Justice.

Appellants, Noble Drilling (US) Inc. and Noble Drilling (Paul Romano) Inc. (collectively, "Noble") and Shell Offshore, Inc. and Shell Deepwater Development, Inc. (collectively, "Shell"), challenge the trial court's judgment, rendered after a jury

## Factual and Procedural Background

Fountain sued Noble and Shell for bodily injuries that he sustained while working for Noble as a roustabout on the NOBLE PAUL ROMANO, a drilling rig located in the Gulf of Mexico. As a roustabout, Fountain's duties included helping other crew members who were shorthanded, cleaning, and lifting.[2] Fountain asserted Jones Act, unseaworthiness, and maintenance and cure claims against Noble and a general maritime negligence claim against Shell, the operator of the well.

Fountain testified that, at the beginning of his shift on October 9, 2002, during a "pre-tour meeting" conducted by his supervisor, Tim Spear, the rig's crane operator, Fountain was assigned to serve as a flagger during the off-loading of a supply

---

1. *See* 46 U.S.C.App. § 688 (2000).

2. Citing to Noble's "Core competency model" for roustabouts, appellants assert in their brief that "[u]nquestionably, lifting and moving heavy objects was a routine part of [Fountain's] job." This document states that roustabouts are "[r]esponsible for rigging and moving of equipment and materials."

ship. Following the meeting, Fountain descended to the supply ship equipped with a portable radio, permitting him to stay in communication with Spear during the off-loading procedure. Fountain explained that for "safety reasons" and to minimize injuries, as well as for ease of use, all cargo loads on supply ships were required to be pre-slung, arriving at the rig "already with the things you need to hook to the crane." Furthermore, to prevent loads "from laying [sic] flat on the deck," making it more difficult to maneuver the loads, all cargo loads were required to be placed on dunnage.[3]

Fountain further testified that, despite these requirements, the last load on the supply ship, "a big bundle of tubing," 20–feet long, was not pre-slung and was "flat on the deck." Fountain noted that the load was "heavy" and two men together would not have been able to lift and carry the load. Two riggers on the supply ship were having difficulty handling this load and "tried to hook the crane up to [the load] by lifting it and getting the slings under, but they couldn't do it by it being flat on the deck." When Fountain radioed Spear and told him that the load was not pre-slung and "laying [sic] flat on the deck," Spear told Fountain to "help." From where Fountain was standing on the supply ship, he could see Spear, and nothing obstructed Spear's view of him.

Fountain, who would not have lifted the load without Spear's instructions, lifted the first side of the load, enabling one of the riggers to place the sling underneath one side. Fountain then lifted the other side of the load, but the rigger could not get the slings underneath the load until Fountain's third lift. During his third lift, Fountain "felt a pop" in his lower back. Later that evening, after Fountain had

returned to the rig, he "couldn't move." Fountain's pain persisted, he was placed on light duty, and he ultimately left the rig. Fountain later learned that he suffered a herniated disc as a result of lifting the load.

On cross-examination, Fountain agreed that, as part of his employment, he had been trained "to lift things properly and safely." He was a certified rigger, who had been taught "how to sling and unsling pieces of equipment," and he had previously "rigged up" and "put slings" on loads. Although Shell, one week prior to the incident, had enacted a formal pre-slinging policy that required all loads to be pre-slung, Fountain, prior to the policy, had been told not to handle loads that were not pre-slung. Fountain also agreed that he was charged with telling Spear "exactly what was going on" on the deck of the supply ship, but reiterated that Spear had "visual sight" of him. When Fountain walked up to the load, he thought that he could lift it and that it was within his "safe lifting capabilities." Fountain conceded that he had "the absolute right to refuse to pick anything up."

Fountain confirmed that, prior to the enactment of the pre-slinging policy, "there were times that [he] would have done the job exactly the same way as [it] was done on the day of the incident." He admitted that he did not ask the riggers on the supply ship to get additional riggers to help, did not tell Spear that he was having trouble, and did not ask for a pry bar to assist with the lift. However, in Fountain's opinion, a pry bar would not have been useful. Fountain maintained that he lifted the load as he was told, stating "that's my job as a roustabout." In his deposition testimony, Fountain had previ-

---

**3.** "Dunnage" is defined as "[p]ieces of wood, matting, or similar material used to keep a cargo in position in a ship's hold." THE NEW OXFORD AMERICAN DICTIONARY 529 (2001).

ously agreed that if he had contacted Spear and told him that the load was too heavy to lift, Spear could have either sent additional help or handled the load another way. Fountain also agreed that when he radioed Spear, he did not discuss the load's weight.

Spear, the crane operator on the rig, testified that, according to Shell policy, the bundle of tubing, which he described as two tubes, 20 feet long, and "three by three" inch, should have been pre-slung. From his position in the crane, roughly 160 feet away, Spear could see the ship's deck, and it looked like the load was sitting flat on the deck. Fountain, as he was required to do, radioed Spear before getting "physically involved in the rig up," told Spear that the load was not pre-slung and was sitting flat on the deck, and asked if he could "help them pick it up." Spear knew from this request that Fountain would "be helping [the riggers] lift the tubing to put the slings underneath." After Spear gave Fountain permission to assist, Spear saw Fountain pick up the first end of the load and the riggers place the sling underneath. Fountain then picked up the other side, the slings were placed underneath, and, using the crane, Spear lifted the load to the rig.

Spear further testified that he should have reported the non-complying load to the barge engineer, his direct supervisor, and that he failed to do so. Spear conceded that he also had the ability to suspend unsafe operations. After learning of Fountain's injury, Spear looked at the tubing, guessed it weighed 200 pounds, and then picked up one end of the tubing by himself, but not to his waist. Although it was a "strain," Spear stated that roustabouts are trained on proper lifting techniques, and, as best he could tell, Fountain properly lifted the load.

Spear conceded that he had trained Fountain that all loads were required to be pre-slung. Despite the fact that the load was not slung, nothing seemed unsafe or dangerous to Spear about Fountain's helping rig the load. When Fountain asked Spear for permission to help the riggers with the load, Spear told Fountain, "If you think you can handle it." Spear denied "ordering" Fountain to help, and stated that he never ordered Fountain to do anything unsafe. Spear did not see Fountain have any problems lifting the first end of the load, and, although his view was partially blocked when Fountain lifted the second end, Spear did not see any problems or difficulties. Spear explained that he could have provided Fountain additional help, but Fountain never told Spear that he was having trouble or needed help, and Spear did not refuse to provide additional help. Spear noted that when a load is too heavy to be lifted by one man, it is possible to use a pry bar for leverage. Spear also noted that prior to the pre-slinging policy, roustabouts performed rigging work on cargo when it arrived on the rig.

Lonnie Neitermayer, appellants' corporate representative, testified that Spear, as crane operator, was in a supervisor position and that the safety of his crew was his responsibility. During Neitermayer's testimony, Fountain introduced into evidence a copy of the "operations procedure for offshore crane operations" in effect at the time of the incident. The procedures established the "requirements for the pre-slinging and containerization of loads being transported" from vessels to Shell locations. Neitermayer explained that, pursuant to this policy, all loads were required to be pre-slung, with no variances or exceptions. Also, Noble was contractually bound to honor Shell's policies, and Shell had a "company man" on the rig to ensure that Shell's "safety policies and procedures [were] followed." Moreover, a Shell repre-

sentative visited the supply ship with the manifest prior to its departure for the rig, went through and photographed "everything . . . located on the deck," and authorized the supply ship to depart for the rig.

Neitermayer further testified that once Fountain notified Spear of the non-complying load, Spear was required to notify his supervisor, the barge engineer, and that the "only legitimate thing" for Spear to do was to reject the load because it was not pre-slung and was not on dunnage. In fact, the policy was in place in light of injuries that could result from lifting loads. Neitermayer stated that from the manifest, he could not determine the weight of the bundle.

Brandon Leblanc, one of the two riggers on the supply ship involved in the offloading process, testified that Fountain, acting as a flagger on the day of the incident, did not have the responsibility to perform rigging. Leblanc denied asking Fountain for assistance or having problems with rigging the loads. Although there were "plenty of people" on the ship who could have assisted, Fountain just "went and grabbed the load" so that he and the other rigger could put the slings on the load. Leblanc described the load as two pieces of 15–20 foot section of square tubing, maybe 2–3 inches around, bundled by some rope, weighing approximately 150 pounds. Leblanc noted that flagman do not normally get involved in the rigging process because "they're not supposed to."

Leblanc further stated that he and the other rigger on the supply ship had previously lifted and moved the load to the rear deck so that the crane could reach it, it "wasn't that difficult" to lift, and he "wouldn't even have considered it a lift." Prior to the ship's departure for the rig, Leblanc and another rigger had picked up the tubing with no problem and carried it approximately fifty feet so that it could be secured on the deck for the voyage. Leblanc thought there was nothing unsafe about the manner in which Fountain lifted the load.

Curtis Little, captain of the supply ship, testified that Shell required his employer, a third party who owned and operated the supply ship, to have certified riggers to handle the cargo. Shell is responsible for generating the cargo manifest for the ship, checking the cargo against the manifest and photographing it from overhead, walking the deck and checking off the cargo, and telling him whether "everything is present and accounted for" and "looks good and safe." Little explained that Shell, prior to a ship's departure, has the opportunity to determine that something is not safe or that something needs to be pre-slung.

Jameson, Noble's Offshore Installation Manager, testified that Spear had told him that Fountain had requested permission to assist the riggers because they were having trouble getting the slings under the load.

Bernard Price, appellants' expert witness, testified that although Shell's offshore and rigging policy is based on the American Petroleum Institute's ("API") recommended practice, the policy far exceeds and is much more stringent than the API recommended practice. Price explained that it is "quite normal" for a crane operator like Spear to take advice from his flagman and that Fountain was doing the work "he would normally be expected to do" as a roustabout. Price stated that, generally, it is the normal practice in the industry to pre-sling those loads that are very heavy or of an unusual shape, but Shell required that everything be pre-slung to go "the extra mile" and to make it "safer" and "quicker."

At the conclusion of trial, the jury found that the negligence, among others, of Noble, Shell, and Fountain caused Fountain's injuries, and allocated 83% of the negligence to Noble, 2% of the negligence to Shell, and 1% of the negligence to Fountain.[4] The jury further found that Fountain "was acting under specific orders at the time of the incident." The jury awarded Fountain compensatory damages for pain and suffering, mental anguish, lost income, impairment of earnings capacity, and medical expenses. Based on the jury's findings, the trial court awarded Fountain $1,345,900.[5]

### Jones Act

In their first and third issues, appellants argue that there is no evidence or factually insufficient evidence "of Jones Act negligence giving rise to Noble's alleged liability" to Fountain because he was injured while performing a routine task that was neither "unreasonably dangerous nor did it subject [him] to an unreasonable risk of harm." Appellants assert that Fountain based his "entire case" on "a self-imposed policy promulgated by Shell" and, absent this policy, which had been adopted by only two operators in the Gulf, the load would have been rigged on the ship's deck and there would have been no basis for this lawsuit. Appellants also assert that Fountain "had the absolute right to refuse to pick up the load," Spear had no knowledge of the weight of the load, and, although Fountain was in a better position "to recognize a risk of harm," Fountain never asked for help.

■■■■ The Jones Act provides a cause of action for maritime workers injured by an employer's negligence.[6] *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 405–06 (Tex.1998); *Diamond Offshore Mgmt. Co. v. Horton*, 193 S.W.3d 76, 78 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). A fundamental duty of a Jones Act employer is to provide its seaman employees with a reasonably safe place to work. *See Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir.1989). A Jones Act claim is an in personam action for a seaman who suffers injury in the course of employment due to negligence of his employer, the vessel owner, or crew members. *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441, 121 S.Ct. 993, 997, 148 L.Ed.2d 931 (2001). Ordinary prudence under the circumstances is the proper standard to be applied in determining the duty of care owed by an employer or by seaman. *Offshore Pipelines, Inc. v. Schooley*, 984 S.W.2d 654, 658 (Tex.App.-Houston [1st Dist.] 1998, no pet.) (citing *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335, 339 (5th Cir.1997)). The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. *Gautreaux*, 107 F.3d at 339. Thus, the reasonable person standard applies, and the standard in a Jones Act negligence action "becomes one of the reasonable seaman in like circumstances." *Id.*

■■■■ Under the Jones Act, a seaman is entitled to recovery if his employer's

---

4. The jury assigned 14% of the negligence to a defendant who is not a party to this appeal.

5. The jury also found that the rig was not unseaworthy at the time of the incident, and the parties settled Fountain's cure claim. Appellants do not challenge the amount of the damages awarded to Fountain.

6. Federal law provides that a party asserting an admiralty action may bring the action in state court. *See* 28 U.S.C. § 1333(1) (2000). When a state court hears an admiralty case, the state court must apply substantive federal maritime law, but follow state procedure. *See Texaco Ref. & Mktg., Inc. v. Estate of Dau Van Tran*, 808 S.W.2d 61, 64 (Tex.1991).

negligence is the cause, in whole or in part, of his injury.[7] *Gautreaux,* 107 F.3d at 335; *see also Rogers v. Mo. Pac. R.R.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957) (noting that under Federal Employers' Liability Act (FELA), causation burden is not common law proximate cause standard, but rather "whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought"). The burden to establish causation under the Jones Act has been termed "featherweight." *See Horton,* 193 S.W.3d at 79. However, liability arises only upon a showing of negligence, not the fact that an injury occurred. *Britton v. U.S.S. Great Lakes Fleet, Inc.,* 302 F.3d 812, 817 (8th Cir.2002) (citing *Consol. Rail Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 2404, 129 L.Ed.2d 427 (1994)). Furthermore, a seaman's contributory negligence "does not bar recovery, but diminishes damages on the basis of comparative negligence in proportion to the amount of negligence attributable to contributory fault." *Broussard v. Stolt Offshore, Inc.,* 467 F.Supp.2d 668, 670 (E.D.La.2006). Thus, a seaman who is injured entirely by his own negligence cannot recover under the Jones Act. *Malefant v. Beatty St. Props., Inc.,* 328 F.Supp.2d 668, 670 (S.D.Tex.2004).[8]

■ Additionally, under the pertinent standard of review in a Jones Act case, the jury is vested with complete discretion on factual issues about liability. *Ellis,* 971 S.W.2d at 406; *Horton,* 193 S.W.3d at 79. Once an appellate court determines that some evidence about which reasonable minds could differ supports a verdict, the appellate court's review is complete. *Horton,* 193 S.W.3d at 78. Essentially, we may not conduct a traditional factual sufficiency review of a jury's liability finding under the Texas "weight and preponderance" standard. *Id.*

We note that much of Fountain's evidence relates to the pre-slinging and dunnage policy violations. For example,

---

7. A seaman who suffers personal injury during the course of his employment is entitled to the rights and remedies available to railway employees. *See* 46 U.S.C.App. § 688(a) (2000). Thus, the cited railway cases apply to our analysis. *See Brown v. Parker Drilling Offshore Corp.,* 410 F.3d 166, 178 (5th Cir. 2005) ("Jones Act cases follow cases under the FELA" [Federal Employer's Liability Act].).

8. Here, the jury was instructed, in regard to negligence under the Jones Act, that,

Negligence is the doing of an act that a reasonably prudent person would not do, or the failure to do something that a reasonably prudent person would do, under the same or similar circumstances. The occurrence of an accident, standing alone, does not mean anyone's negligence caused the accident. In a Jones Act claim, the word 'negligence' is given a liberal interpretation. It includes any breach of duty that an employer owes to his employees who are seamen, including the duty of providing for the safety of the crew.... Negligence under the Jones Act may consist of a failure to comply with a duty required by law. Employers of seamen have a duty to provide their employees with a reasonably safe place to work. If you find that [Fountain] was injured because Noble failed to furnish him with a reasonably safe place to work, and that [Fountain's] working conditions could have been made safe through the exercise of reasonable care, then you must find that Noble was negligent. The fact that Noble conducted its operations in a manner similar to that of other companies is not conclusive as to whether Noble was negligent or not. You must determine if the operations in question [were] reasonably safe under the circumstances....

Neither party complains about the above instructions, which were based, in large part, on the Fifth Circuit Pattern Jury Instructions. *See* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS CIVIL (2004).

Fountain stated that these policies were enacted for "safety reasons" and to minimize injuries in maneuvering loads. Neitermayer agreed that there were no variances or exceptions to the slinging policy applicable to this load. Also, Andrew Mclean, the "technical authority for hoisting and lifting in [Shell's] maintenance integrity department," stated that the slinging policy eliminated the obvious hazards in manually lifting a load. Appellants contend that a violation of a company policy does not necessarily establish the violation of a legal duty giving rise to a claim for negligence; however, such a violation can be a relevant consideration in determining an employer's negligence. Regardless, contrary to appellants' assertion, Fountain's evidence was not limited solely to violations of these policies.

Here, Fountain presented evidence that two riggers on the supply ship were having difficulty handling the load, which was not pre-slung and was "flat on the deck." Consequently, Fountain radioed Spear, who had an unobstructed view of the deck, and informed him of the non-complying load and the difficulty the riggers were having with the load. Spear then, according to Fountain, instructed Fountain to "help." Although Fountain agreed that he and Spear did not discuss the weight of the load, Jameson, Noble's Offshore Installation Manager, testified that Spear had told him that Fountain had told Spear that the riggers were having difficulty with it. Fountain did agree that he initially felt that the load was within his "safe lifting capabilities" and that he had the right to refuse to lift the load, but he explained that he was simply doing what he was told to do by Spear.

In regard to the weight of the load, Fountain described the load as heavy, denied that two men could carry the load, and felt that by ordering him to lift the load, Spear had ordered him to perform an unsafe task. On the other hand, Leblanc, one of the ship's riggers, testified that he and another rigger had previously lifted the load without difficulty. Although Spear's testimony regarding the weight of the load was unclear, he did state that lifting it caused a "strain." Nevertheless, the other evidence generally showed that the load weighed approximately 150–200 pounds. Finally, notwithstanding Shell's policy, Andrew Mclean, a Shell employee, opined that pre-slinging was a "common practice" or "best practice" "in a number of areas of the world in offshore operations and cargo handling."

Appellants assert, without citation to any record evidence, that "[t]his is not a case where Fountain was asked or ordered to pick up something that was too heavy for him to lift." However, a review of the conflicting evidence, as outlined above, reveals that this is precisely the issue that the jury was asked to resolve. Even though Fountain agreed that, as a roustabout, his general duties included lifting, and appellants presented conflicting evidence on the controlling issues of the weight and configuration of the load and the reasonableness and scope of Spear's instruction to lift it, Fountain did present some evidence to support the jury's finding under the Jones Act that Noble failed to provide Fountain a reasonably safe place to work. *See Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186, 188 (5th Cir.1991) (affirming negligence finding under Jones Act in favor of plaintiff who was injured after fellow employee who, as a result of the employee's pre-existing injury, shifted disproportionate amount of weight onto plaintiff while plaintiff and employee were lifting equipment); *Broussard,* 467 F.Supp.2d at 674 (finding that employee failed to act with ordinary prudence by using unsafe method to lift fuel transfer hose); *Agbayani v. Cal Dive Int'l, Inc.*,

No. 05–0881, 2006 WL 3230302, at *4 (W.D.La.2006) (finding repeated instruction from operator to lift heavy object that plaintiff could not "budge" raised fact issue on claim that employer breached obligation to provide safe place to work); *see also Britton,* 302 F.3d at 817–18 (concluding that employee raised fact issue on Jones Act negligence claim with evidence that back injury was caused by shortage of deck hands that resulted in work too strenuous for one man).

■ Accordingly, we hold that there is legally sufficient evidence to support the jury's finding of negligence against Noble under the Jones Act. *See Ellis,* 971 S.W.2d at 406; *see also Gautreaux v. Ins. Co. of N. Am.,* 811 F.2d 908, 913 (5th Cir.1987) ("It is within the jury's province to weigh conflicting testimony, and as long as there is evidence supporting the verdict, it will be upheld.").

We note that appellants' evidentiary complaints generally focus on Fountain's alleged contributory negligence. *See Broussard,* 467 F.Supp.2d at 674 (finding that seaman had obligation to tell fellow employee to stop lifting hose in unsafe fashion once seaman perceived lift to be unsafe, and assigning 40% contributory fault to seaman). For example, appellants presented some evidence that Fountain failed to request additional help, failed to use the proper equipment, and failed to notify Spear that he was having trouble with the lift. The jury heard this evidence, and it was entitled to consider this evidence in apportioning negligence against Fountain. *See id.* Given the pertinent standard of review, we cannot conclude that the jury's findings of negligence against appellants are based on insufficient evidence.

■ Appellants also assert that the evidence of negligence is insufficient because Fountain failed to present expert witness testimony on the standard of care owed to Fountain during the off-loading operation. However, such expert testimony is not required in this context. *See Peters v. Five Star Marine Serv.,* 898 F.2d 448, 450 (5th Cir.1990) (holding jury, using only their common experience and knowledge, could adeptly assess whether it was reasonable for employer to instruct his employee to move equipment on deck of boat during heavy seas and whether employer improperly stowed cargo).

Finally, appellants rely on *Harrison v. Seariver Maritime,* 61 Fed. App'x 119, No. 02–40307, 2003 WL 342266 (5th Cir.2003), in support of their argument that because picking up objects is a "routine, ordinary task" for roustabouts and deckhands, there is no evidence that "this practice is negligent." However, *Harrison* is substantively distinguishable. In *Harrison,* a ship employee alleged that she injured her knees while moving hoses about the ship. *Id.* at *3. Noting that an employer "is not an insurer of a seaman's safety," the United States Court of Appeals for the Fifth Circuit held that the employer did not violate its duty to exercise reasonable care with respect to workplace safety and that the trial court's Jones Act negligence finding was clearly erroneous. *Id.* at *4. The court's holding was based, in part, on the fact that the assigned task "was routine and certainly not hazardous; moving shipboard equipment is a common and expected physical task [, and] [o]rdinary prudence is exercised when a safe procedure is used for a routine task, even when a safer procedure might exist." *Id.* at *5 (citations omitted). The court noted that although the plaintiff's proffered method of lowering the hoses would have been safer, there was no evidence that the method actually used was unsafe. *Id.* The court further noted that there was no evidence that the manpower assigned to the task

was inadequate or that the job was too difficult or complicated. *Id.* at *6.

Here, in contrast, in addition to the evidence of a policy violation, Fountain presented evidence that he was assigned the task of lifting an object that was too heavy, was not slung, and was not on dunnage after he informed his supervisor that two riggers on the supply ship were having difficulty with the load. Although Spear contended that he permitted Fountain to get involved only if he thought he could handle it, Fountain presented some evidence that would support the jury's finding that the instruction to become involved in this lift, under the circumstances, was unsafe.

We overrule appellants' first and third issues.

### General Maritime Negligence

In their second and fourth issues, appellants argue that there is no evidence or factually insufficient evidence "of general maritime negligence as to Shell's conduct" in regard to Fountain's injuries because he was injured while performing a routine task that was neither "unreasonably dangerous" nor did it subject him to "an unreasonable risk of harm." Appellants assert that although Shell had a company man aboard the rig, there is no evidence that "he knew or should have known of the situation" and there is no evidence that any Shell personnel were present when Fountain and Spear discussed the noncomplying load. Appellants argue that the evidence actually shows that they complied with the slinging policy because the tubing was loaded on the ship by a crane using

slings. In sum, Shell asserts that the only evidence pertaining to Shell was that it promulgated a slinging policy to which its contractors were required to adhere.

 The parties agree that Fountain's claim against Shell is governed by general maritime law. The standard of review for claims arising under general maritime law is the so-called "reasonable minds" standard. *Fontenot v. Teledyne Movible Offshore, Inc.,* 714 F.2d 17, 19 (5th Cir.1983) (citing *Comeaux v. T.L. James & Co.,* 666 F.2d 294, 298 (5th Cir.1982)). This standard requires appellate courts to judge in light of all the evidence whether " 'reasonable men could not arrive at a contrary verdict' to that urged by the movant." *Fontenot,* 714 F.2d at 19 (citing *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331 (5th Cir.1997) (en banc)). A mere scintilla of evidence is insufficient to present a question for the jury. *Boeing Co.,* 411 F.2d at 374. Rather, there must be a conflict in substantial evidence to create a jury question. *Id.* at 375. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. *Id.*

 To prevail on a negligence claim brought under general maritime law, a plaintiff must establish (1) the existence of a duty owed by the shipowner or operator, (2) a breach of that duty, (3) proximate cause, and (4) injury and damages.[9] *Champagne v. Tetra Applied Techs., Inc.,* No. Civ. A. G–05–299, 2005 WL 3478171, at

---

9. Here, the jury was instructed,
 Negligence under the general maritime law is the doing of an act that a reasonably prudent person would not do, or the failure to do something that a reasonably prudent person would do, under the same or similar circumstances. The occurrence of an accident, standing alone, does not mean anyone's negligence caused the accident.
 The parties did not complain about this instruction.

*3 (S.D.Tex. Dec. 20, 2005) (citing Thomas J. Schoenbaum, Admiralty & Maritime Law § 5–5 (4th ed.2004)); *see also Johnson v. Offshore Express, Inc.,* 845 F.2d 1347, 1354 (5th Cir.1988) (general maritime law requires proof of proximate cause). General maritime law imposes "a general burden of reasonable care." *See River Transp. Assocs. v. Wall,* 5 F.3d 97, 100 (5th Cir.1993); *see Smith v. S. Gulf Marine Co. No. 2, Inc.,* 791 F.2d 416, 421 (5th Cir.1986) ("[A] shipowner owes to passengers the duty of exercising 'reasonable care under the circumstances of each case.' ") (quoting *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959)).

In support of the negligence findings against Shell, Fountain cites evidence that, according to him, establishes that a "Shell representative knew or should have known that the bundle ... was not pre-slung at the time" the ship departed for the rig. Fountain primarily relies on the testimony of Curtis Little, the captain of the supply ship, who testified that Shell generated the cargo manifest for the ship, checked the cargo against the manifest "right there at departure time," and told him that "everything [was] present and accounted for" and "look[ed] good and safe." Fountain also refers to Neitermayer's testimony that Shell violated its own policy if its representative authorized the ship to go to the rig with the non-complying load.

 We conclude that this evidence would not have enabled reasonable jurors to find Shell negligent. Even assuming that the evidence would have permitted a finding that Shell was aware that the load was not pre-slung at the time of the ship's departure, this evidence at most would permit a finding that Shell was aware of a policy violation, not that it breached any duty that it owed to Fountain or that any breach of a duty by Shell caused Fountain's injuries.

As Fountain made clear at trial, and as he emphasizes in his briefing to this Court, the findings of negligence against Noble under the Jones Act are supported not merely by the simple fact that Noble and Shell violated the pre-slinging and dunnage policies, but rather by Noble's conduct once Fountain encountered the non-complying load when he was aboard the supply ship. However, Fountain did not present any evidence that Shell supervised or was responsible for controlling the specific off-loading procedures in which Fountain participated. Moreover, Fountain has not made any showing or argument that Shell is legally responsible for Noble's conduct due to their business relationship. Accordingly, we hold that the evidence is legally and factually insufficient to support the findings of negligence against Shell under general maritime law.

We sustain appellants' second and fourth issues.

### Conclusion

We affirm the judgment of the trial court rendered against Noble, reverse the judgment rendered against Shell, and render judgment that Fountain take nothing on its claim against Shell. We remand the case to the trial court for the entry of a new judgment consistent with this opinion.