

# NUMBER 13-13-00254-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ORION MARINE CONSTRUCTION, INC.
F/K/A KING FISHER MARINE SERVICE, L.P.,                    Appellant,

v.

HECTOR DE LEON,                    Appellee.

## On appeal from the 275th District Court
## of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Benavides
### Memorandum Opinion by Chief Justice Valdez

Appellant, Orion Marine Construction, Inc. f/k/a King Fisher Marine Services, appeals from a judgment in favor of appellee, Hector De Leon. By seven issues, Orion contends that (1) the imposition of liability for either alleged Jones Act negligence or unseaworthiness of Orion's vessel, the Austin B, was legally impermissible for several reasons, (2) the evidence was legally and factually insufficient to support the jury's finding that appellee sustained injury, (3) the award of damages for future medical expenses,

past lost income, future lost earning capacity, and mental anguish were either legally or factually insufficient or both or erroneous (issues three through six), and (4) the amount awarded by the jury for mental anguish, past, future, or both was manifestly excessive (issue seven).  We affirm.

## I.  BACKGROUND

Appellee sued Orion, his employer, alleging negligence and unseaworthiness of the Austin B under the Jones Act and general maritime law.  *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 405 (Tex. 1998) (explaining that "[t]he Jones Act provides a cause of action for maritime workers injured by an employer's negligence.").  Appellee claimed that he sustained injuries on March 25, 2007, on the Austin B.

The trial court's jury charge instructed that if the jury "found that [appellee] was injured because Orion failed to furnish him with a reasonably safe place to work, and that [appellee's] working conditions could have been made safe through the exercise of reasonable care, then you must find that Orion was negligent."  The trial court further instructed the jury that "[u]nder the Jones Act, if the employer's negligent act caused the plaintiff's injury, in whole or in part, then you must find that the employer is liable under the Jones Act."  Regarding seaworthiness, the trial court instructed the jury that if it found

> that the owner of the vessels [sic], Orion, did not provide an adequate crew of sufficient manpower to perform the tasks required, or if you find that the vessel was in any manner unfit in accordance with the law as I have just explained it to you and that this was a proximate cause of [appellee's] injuries . . . then you may find that the vessel was unseaworthy and Orion liable, without considering any negligence on the part of Orion or any of its employees.

The jury returned a verdict in favor of appellee on both his Jones Act claim and his unseaworthiness claim, and it awarded damages to appellee in the amount of $866,000, which included $90,000 for past lost income, $350,000 for lost future earning capacity,

2

$200,000 for future medical expenses, and $150,000 for past and future mental anguish. The jury found that appellee's negligence contributed to his injury by ten percent. Orion filed motions for a judgment notwithstanding the verdict and for a remittitur of damages. The trial court denied both motions, and it signed the judgment awarding appellee the sum of $779,400. Orion filed a motion for new trial, which the trial court denied. This appeal followed.

## II.   STANDARD OF REVIEW AND APPLICABLE LAW

In a legal sufficiency review of the evidence, we must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable fact finders could and disregarding contrary evidence unless they could not. *Maritime Overseas Corp.*, 971 S.W.2d at 406; *see City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We may sustain a no-evidence challenge if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810.

We examine the entire record, considering both the evidence in favor of and contrary to the challenged finding in our factual sufficiency review. *Maritime Overseas Corp.*, 971 S.W.2d at 406–07. In reviewing a factual-sufficiency challenge to a finding on an issue on which the appellant did not have the burden of proof, we will set aside the verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The fact finder is the sole judge of the witnesses' credibility and may choose to believe one witness over another. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d

3

757, 761 (Tex. 2003). We may not substitute our own judgment for that of the jury, even if we would reach a different answer based on the evidence. *GTE Mobilnet of S. Tex. L.P. v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing *Maritime Overseas Corp.*, 971 S.W.2d at 407).

A party alleging liability for negligence under the Jones Act must prove (1) his employer's negligence (2) wholly or partially caused (3) personal injury (4) in the course of employment. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997). An employer of a seaman owes the seaman a duty to provide a reasonably safe place to work. *Noble Drilling (US) Inc. v. Fountain*, 238 S.W.3d 432, 439 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

A vessel is unseaworthy unless it and its appurtenances are reasonably fit for their intended purpose. *Marine Transport. Corp. v. Methodist Hosp.*, 221 S.W.3d 138, 146 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). To prevail on a claim that a vessel is unseaworthy, the seaman must prove that the unseaworthy condition played a substantial part in causing the injury that was a direct result or reasonably probable consequence of the condition. *Offshore Pipelines, Inc. v. Schooley*, 984 S.W.2d 654, 658 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

### III. LIABILITY UNDER THE JONES ACT

By its first issue, Orion contends that "the jury's liability findings of Jones Act negligence and unseaworthiness cannot support liability" because (1) appellee was incompetent to testify as a witness, (2) Orion "had no duty or recovery was barred under the primary duty doctrine," and (3) there was no evidence that the antiskid caused the 2007 incident. By its second issue, Orion contends that the evidence is legally and factually insufficient to establish that appellee sustained injuries from the 2007 incident.

4

## A.    Competence

Citing Texas Rule of Evidence 603, Orion argues that "[appellee] did not meet the minimum standards of witness competency" because there were numerous inconsistencies in his testimony, damaging disclosures, and appellee's trial counsel "showed that [appellee] could not and should not be believed." *See* TEX. R. EVID. 603 (setting out that a witness must give an oath to testify truthfully). In general, "[e]very person is competent to be a witness." *See* TEX. R. EVID. 601. Thus, to preserve this issue for our review, Orion was required to object at trial on the basis that appellee was incompetent to testify. *See* TEX. R. APP. P. 33.1(a). Here, Orion did not object during the trial on that basis. *See id.* Therefore, any such argument has not been preserved.

## B.    Primary Duty Doctrine

Next, Orion argues that appellee's recovery is barred as a matter of law under the primary duty doctrine. "The doctrine, developed by the Second Circuit in *Walker v. Lykes Bros. S.S. Co.*, 193 F.2d 772 (2d Cir.1952), requires a bar to recovery when the only cause of a ship officer's injury is the breach of a duty he owed his employer. . . ." *Malenfant v. Beatty St. Props., Inc.*, 328 F. Supp. 2d 668, 670 (S.D. Tex. 2004) *rev'd on other grounds*, 133 Fed. Appx. 985 (5th Cir. 2005) (mem. op.).[1]

However, "[t]he Fifth Circuit does not recognize the primary duty doctrine as a bar to recovery in a Jones Act negligence suit." *Whitman v. Hercules Offshore Corp.*, No. CIV A 06-0229, 2006 WL 3718225, at *4 (W.D. La. Dec. 15, 2006) (concluding that in affirming the lower court's decision in *Malenfant*, 328 F. Supp. 2d at 670, the Fifth Circuit

---

[1] Orion cites a case from the second circuit, *Dixon v. United States*, 219 F.2d 10, 16–17 (2nd Circ. 1955), and a case from the ninth circuit, *Bernard v. Maersk Lines, Ltd.*, 22 F.3d 903, 905 (9th Circ. 1994) as its only supporting authority.

5

had not adopted the primary duty doctrine in *Malenfant*, 133 Fed. Appx. 985). Instead, "[t]he Fifth Circuit has held that a Jones Act Seaman is obligated to act with ordinary prudence under the circumstances. This standard of care is the same one required by common law, and a seaman who is injured *entirely by his own negligence* cannot recover under the Act." *Malenfant*, 328 F. Supp. 2d at 670.

The only federal authority that we have found does not support a conclusion that the Fifth Circuit has adopted the primary duty doctrine, and we have found no Texas authority on the subject. Thus, we reject Orion's argument that under the primary duty doctrine, appellee's claims are barred.

Moreover, at trial, there was ample evidence presented that appellee's injury was not caused *entirely* by his own negligence. *See id.* Henry S. Woods III, appellee's expert, testified that appellee did nothing wrong regarding the 2007 incident. And, Woods opined that there were other conditions that made the boat not reasonably fit for its intended use, which included evidence that the area where appellee fell lacked handrails, the nonskid paint used on the deck was inferior requiring that iron rods be placed on the deck, Orion had a duty to inspect the nonskid paint but did not do so, Orion failed to keep written records of any inspections of the vessel although required to do so, and Orion failed to provide a safe means for boarding or leaving the vessel to prevent falls or slips. Orion did not present any expert testimony to the contrary and did not present any expert testimony that appellee breached any duty owed to Orion, which is an element required under the primary duty doctrine, even assuming it applied.[2] *See id.* Therefore, because there was some evidence that appellee did not cause his own injuries entirely, we cannot

---

[2] Appellee testified that he had informed the captain about the lack of nonskid paint on the deck prior to his accident.

6

conclude that the evidence established as a matter of law that appellee cannot recover under the Jones Act. *See id.*; *see also Cameron v. United States*, 135 F. Supp. 2d 775, 778 (S.D. Tex. 2001) ("Even if the Primary Duty Doctrine applied, current caselaw instructs that the factfinder should endeavor to apportion responsibility for the injury.").

## C. Legal Sufficiency of the Evidence Regarding the Nonskid Paint and Injuries

Next, Orion argues that there was no evidence that the condition of the nonskid paint caused the incident in question. We construe this argument as challenging the jury's implied finding that appellee slipped and fell as a result of the lack of nonskid paint on the deck. By its second issue, Orion challenges the jury's implied finding that appellee's injuries were caused by his slip and fall on the Austin B.

Evidence at trial showed that the deck of the boat required nonskid paint in all areas where the men walked and that one of appellee's responsibilities was to ensure that there was in fact nonskid paint. However, according to appellee, prior to his accident, when he noticed that the nonskid on the deck needed painting, he was unable to paint it because the seamen "were always working," and under the pertinent rules, repairs were to be made only during down–time, when the seamen were not working.[3] Appellee explained that if he had painted the deck while the boat was in use, the paint "would not stick" because "the top part of the boat was always wet."

Appellee testified that after stepping onto the boat's deck from an extension barge, he fell on the starboard bow of the boat, which is the front right side of the boat, and he landed on the pad eye. He asserted that when he fell, he hurt his back, right arm, and

---

[3] The trial court admitted logs from the time period showing that there was no down–time/standby time for appellee to paint the deck when he was working. However, the logs showed that there had been down–time during another worker's shift, when appellee had not been working, who would have been able to make any necessary repairs.

leg.[4]  Appellee testified that when he was working and stepping onto the deck, he had to step "[a]bout a foot and a half, to two feet" sometimes even when the boat was moving. According to appellee, the surface of the deck was "always wet" when he stepped onto the deck.  Appellee stated that when he fell, he stepped onto the boat "one step, two steps, and I fell on my back."

The trial court admitted pictures Orion took in April 2008, a year after the incident, of the area on the Austin B where appellee slipped and fell.  When his trial counsel showed him one of the 2008 pictures of the Austin B, appellee stated that the pictures showed that deck needed painting when they were taken.  Appellee explained that on the day of the incident, the condition of the paint had been worse than it appeared in the 2008 pictures.  In addition, appellee's trial counsel pointed out that other pictures taken in 2010 of the area where the incident occurred showed how the deck should have looked if it had been properly painted.  Appellee agreed that the 2010 pictures showed that the deck had been properly painted with the nonskid, and he stated that the deck looked different from how the deck looked when he had his accident.  Specifically, appellee said that it was different because "[t]he boat looks like it's been painted."  Appellee agreed with his trial counsel that he could see the nonskid sand in the paint in the 2010 pictures.  According to appellee, the 2010 pictures also showed that rods were added "to create even more traction" and that those rods were not there when he slipped and fell.  When his trial counsel asked, "Is that true, the boat deck is what caused your injury," appellee replied, "Yeah, that's right."

---

[4] Evidence showed that the "pad eye" is where the seamen "h[u]ng the tires on the boat."

Woods testified that "[t]he conditions that existed on the date of [appellee's] accident were unsafe." When reviewing the 2008 pictures, Woods testified as follows: "Yes, the condition on the deck is a major focus for me. You got nonskid [paint] missing there. And where a person would board that boat in their method trancing from the extension boards, and there is no added abrasion like the welding rods." When appellee's trial counsel questioned Woods about the 2008 pictures of the boat, asking, "In your opinion, based on many, many years of experience, is this boat safe for boarding and unboarding," Woods replied, "Not in that position, and not in this maintenance condition for nonskid." Woods agreed with appellee's trial counsel that other witnesses had testified that the condition of the nonskid in the 2008 pictures was similar to its condition at the time of the accident. When asked to explain why the accident occurred, Woods said:

> In reviewing all of this, analyzing it, all of this we just talked about, a very large first step is required to board. There are no bow rails on the tender vessel. And so a large first step is required. The quality of the nonskid is low quality. It has a short shelf life. And although many better alternatives have been available for a long time and were then available, those were not utilized. And then, you know, there's a matter of traction and balance for a person that's making that large step, needs to steady themselves. And then finally, the method of boarding. If the tender boat is perpendicular to the barge, it's a little more unsteady and a little more difficult than it would be if the tender boat came up alongside and moved parallel to the extension barge.

During his testimony, Woods read from Orion's investigation report made one day after the accident, which identified the potential cause of appellee's injury as, among other things, the "boat deck." Edilberto Cantu testified that the area of the deck where appellee fell could have been slippery if it lacked nonskid paint as depicted in the 2008 pictures.

Appellee's trial counsel asked Captain Sergio Garcia to explain the purpose of the iron rods that had been welded into the areas of the deck beside the bow, and Captain Garcia responded that those are areas where the deck hands stand to tie up the boat.

9

When asked by appellee's trial counsel whether the iron rods welded into the deck to increase traction were on the Austin B at the time of the incident, Captain Garcia could not recall.[5]  Captain Garcia testified that the 2008 pictures taken by Orion showed that the paint had worn off of the deck and that the deck needed repainting.  Captain Garcia stated that the pictures showed that the Austin B was in the same condition as he has always remembered it being.

Captain Garcia testified that the bow of the Austin B does not have a handrail and that the workers must take two to three steps to get from the edge of the extension barge to where the handrail is located.  Captain Garcia acknowledged that it is more difficult for the workers to keep their balance stepping onto the boat because of the wave action and stated that the hand rail located on the wheel house is not next to where the workers step off the boat.

Kenneth Berliner, M.D. testified as follows:

Q.    Doctor, now given all of the evidence that you're aware of, the history that you took on both before the accident and after the complaints made, before the March accident and after, all of the diagnostic tests, your course and treatment of him, do you have an opinion based on reasonable medical probability as to whether his current condition was caused in whole or in part by the accident of March the 25th 2007?

A.    Yes, I do.

Q.    What is that opinion?

A.    It is my opinion that the symptoms that he's currently experiencing, and that his current problems *are directly related to the accident from March the 25th 2007*.[6]

---

[5] Appellee testified that the iron rods welded into the deck, which were meant to prevent a person from slipping, were not present at the time of the incident.

[6] Orion complains that there was no evidence that appellee's injuries were caused by his slip and fall on the Austin B.  However, we conclude that this testimony alone provides more than a scintilla of

10

Q.    Do you have an opinion as to whether these medical bills that you believe based on reasonable medical probability he will require in the future were caused by the accident of March the 25th 2007, or made necessary by the accident of March the 25th 2007?

A.    Yes, I do.

Q.    What is that opinion?

A.    *That those surgeries were made medically necessary by the accident of March the 25th 2007.*

. . . .

Because, well basically he had an incident of significance on March the 25th 2007 which could transmit the types of forces that would be necessary to those areas that could cause these types of diagnosis. And the patient had, you know, the change on his MRI of the spasms. And he has the evidence on the discogram of the annular tear.

Also, I saw him prior to the accident and after the accident, and the shoulder is significantly worse. *All these kinds of things tie together to point to the March 25th 2007 incident, as the source of his current problems.*

(Emphasis added).

Appellee was required to prove that Orion failed to furnish him with a reasonably safe place to work and that the Austin B was unfit in any manner. *Gautreaux*, 107 F.3d at 335; *Noble Drilling (US) Inc.*, 238 S.W.3d at 439; *Marine Transport. Corp.,* 221 S.W.3d at 146. Viewing the evidence, as set out above, in the light most favorable to the verdict, crediting favorable evidence if reasonable fact finders could and disregarding contrary evidence unless they could not, we conclude that more than a scintilla of probative evidence was presented to support the jury's findings that the lack of appropriate nonskid paint on the deck of the boat caused appellee to slip and fall, which then caused

---

probative evidence to support a finding that appellee's injuries were caused by his slip and fall.

11

appellee's injuries. *See Maritime Overseas Corp.*, 971 S.W.2d at 406; *see also City of Keller*, 168 S.W.3d at 822.

**D.      Factual Sufficiency of the Evidence Regarding Appellee's Injuries**

Next, Orion argues that the evidence was factually insufficient to support the jury's implied finding that his slip and fall in 2007 caused his shoulder and back conditions. Specifically, Orion cites the following:   (1) "MRIs and x-rays showed that [appellee's] physical condition for both back and shoulder was the same before and after the 2007 incident"; (2) "[t]he before-and-after MRIs show that [appellee's] shoulder was unchanged"; (3) "nothing eliminates the obvious likelihood that [appellee's] complaints of ongoing shoulder pain and the observations of tenderness were the likely natural result of [a] spur that existed long before the 2007 incident"; (4) "Dr. [J. Randolph] Jinkins . . . a neuroradiologist, and [Dr. Andrew] Kant rejected any connection between the 2007 Incident and [appellee's] reports of increased duration of subjective pain after the 2007 Incident"; and (5) according to Dr. Kant, there was no objective medical evidence of traumatic injury.

Although there was evidence presented that appellee had suffered a prior injury to his shoulder in 2005, appellee also presented evidence that the shoulder injury became worse after his slip and fall in 2007.   Specifically, Dr. Berliner testified that he "saw [appellee] prior to the accident and after the accident, and the shoulder is significantly worse."  In addition, Dr. Berliner concluded that appellee's shoulder condition was caused or aggravated by the 2007 incident.  And, although Dr. Jinkins rejected any connection between the 2007 incident and appellee's injuries, Dr. Berliner opined that the 2007 incident caused appellee's injuries, which included a shoulder injury and a back injury requiring surgery.   Moreover, Dr. Berliner explained that the type of injury appellee

12

suffered to his back, an annular tear, will not always show up on an MRI. Dr. Berliner stated that although the MRI may have not picked up the annular tear in appellee's back, the discogram and subsequent CAT scan read by another doctor had shown the annular tear.[7] According to Dr. Berliner, the other doctor who performed the CAT scan confirmed his findings of an annular tear, and the CAT scan showed that appellee had a grade five annular tear, "[b]ased on the fact that the tear went all the way through the annulus, and there was extravasation of the contrast to the epidural space." Dr. Berliner testified that a CAT scan is considered an objective as opposed to a subjective test because "[t]he patient's brain is completely detached from this [test]. We took a picture and anyone can look at it, and it doesn't require [appellee's] participation in any way." When asked if a person is able to fake a grade–five annular tear, Dr. Berliner said, "No." Thus, contrary to Orion's assertions, appellee presented objective evidence of a traumatic injury that according to Dr. Berliner was caused by the slip and fall in 2007. Dr. Berliner testified that appellee's description of where he had back pain was concordant, and it matched up with the location of the annular tear. Finally, as previously stated, Dr. Berliner testified that the surgeries he recommended were made medically necessary by the 2007 incident.[8]

After examining the entire record, considering both the evidence in favor of, and contrary to, the challenged finding we cannot conclude that the verdict is so contrary to

---

[7] Dr. Berliner explained that a "[d]iscogram is a test that specifically looks at the disc, itself. And it had got several components to it. It has a provocative portion, which is kind of like a physical exam. And then it's also got an imaging portion, which allows us to look at it kind of like an x-ray." Dr. Berlined stated that "a CAT scan is a variation of an x-ray. The pictures . . . make cross-sectional pictures." He explained that the CAT scan is similar to an MRI but instead used x-ray technology

[8] Dr. Berliner also explained in great detail the type of annular tear he found that appellee had and the jury saw the CAT scan, MRI, and discogram.

13

the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d at 176. We conclude that the evidence is factually sufficient to support this challenged implied finding. We overrule Orion's first and second issues.

## IV. DAMAGES

By its third through sixth issues, Orion contends that the evidence to support the jury's award of damages for future medical expenses, lost income, lost earning capacity, and mental anguish is erroneous for several reasons as set out below. By its seventh issue, Orion contends that the amount of damages awarded for mental anguish is manifestly excessive.

### A. Future Medical Expenses

By its third issue, Orion contends that there is no evidence to support the jury's award of $200,000 for future medical expenses. Next, Orion argues that the evidence is legally insufficient to support the jury's award of damages for appellee's future medical expenses because there was no evidence that (1) conservative treatment would not have achieved the desired result, (2) other treatment options were exhausted, and (3) the surgeries were reasonably necessary to treat appellee's symptoms.

> [I]n order to recover future medical expenses, a plaintiff is required to show there is a reasonable probability that medical expenses resulting from the injury will be incurred in the future and then show the reasonable costs of such care. It is within the jury's sound discretion to determine what amount, if any, to award in future medical expenses. Because no precise evidence is required, the jury may award such damages based on the nature of the injury, the medical care rendered before trial, and the condition of the injured party at the time of trial.

*Pilgrim's Pride Corp. v. Cernat*, 205 S.W.3d 110, 121 (Tex. App.—Texarkana 2006, pet. denied) (internal citations omitted).

14

Dr. Berliner testified that the future cost of appellee's back surgery would be $96,700 and that the future cost of his shoulder surgery would be $28,000, which totals $124,700. However, based on the above cited factors, including, among other things, appellee's past medical care, and giving the jury's decision the deference that we must, the jury could have determined that appellee would also incur $75,300 in future medical expenses.[9] *See id.* Thus, viewing the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable fact finders could and disregarding contrary evidence unless they could not, we conclude that the evidence is legally sufficient to support the jury's award of future medical expenses. *See Maritime Overseas Corp.*, 971 S.W.2d at 406; *see also City of Keller*, 168 S.W.3d at 822.

As to its second argument, Orion provides no authority supporting a conclusion that we must find the evidence insufficient to support the award of future medical expenses when the record does not include evidence that conservative treatment would not have achieved the desired result or that other treatment options were exhausted. Thus, we are not persuaded by these arguments. In addition, Dr. Berliner testified that the shoulder and back surgery were needed based on a reasonable medical probability. Thus, contrary to Orion's argument, there is some evidence to support a finding that the surgeries were reasonably necessary to treat appellee's symptoms. Accordingly, we cannot conclude that the evidence is legally insufficient on that basis. We overrule Orion's third issue.

---

[9] In addition, during Dr. Berliner's testimony, appellee's trial counsel offered exhibit no. 35, a summary of Dr. Berliner's testimony concerning appellee's future medical bills, and the trial court admitted it pursuant to rule 1006 of the Texas Rules of Evidence. *See* TEX. R. EVID. 1006 (allowing the proponent to provide "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court").

**B.      Lost Income**

By its fourth issue, Orion contends that although the jury awarded appellee $90,000 for lost income, the evidence only supports an award of $10,000 in lost income. Specifically, as we understand it, Orion argues that because Kenneth McCoin, PhD, appellee's forensic economist, "adopted the earnings at Flint as [appellee's] post-2007 incident earning capacity," there was no evidence of $90,000 in lost income.

Dr. McCoin testified that appellee's lost income was $92,194.  Specifically, Dr. McCoin concluded that appellee would have earned a net income of $122,058 from the time of the 2007 injury causing incident to the time of the trial if he had continued working at Orion.  However, Dr. McCoin stated that the sum should be reduced by $29,864, which was the amount that appellee made while working at Flint after the accident but prior to the trial, providing for a total of $92,194.  Contrary to Orion's argument, Dr. McCoin stated that appellee's average income *at the time of his injury in 2007* was $39,000 per year, and that is the "starting point for these types of calculations, because parenthetically, he was earning a little bit more than that if you annualized what he actually earned up to that point in time."[10]  (Emphasis added.)  Thus, Dr. McCoin's calculation of appellee's average income was based on what he earned while employed by Orion and was not based on what he earned at Flint after the accident and prior to the trial.  Accordingly, we conclude that Orion's argument regarding Dr. McCoin's testimony is without merit, and we cannot conclude that the evidence is insufficient on that basis.  We overrule Orion's fourth issue.

---

[10] Dr. McCoin subtracted appellee's earnings at Flint to arrive at his $92,194 calculation of lost income.

16

## C.    Lost Earning Capacity

By its fifth issue, Orion contends that there is legally and factually insufficient evidence to support the jury's award of $350,000 for lost earning capacity.  Specifically, Orion argues that the jury based its award of lost earning capacity damages on conjecture because Dr. McCoin testified that over a 24.8–years'–working–life at an assumed annual income of $27,000, appellee lost earning capacity would be $291,319 and that Dr. McCoin's lost earning capacity calculation is based on erroneous current earnings data.[11] Appellee responds that both arguments are incorrect.

First, although Dr. McCoin testified that appellee's assumed annual income would have been $27,000 at Flint after the accident, he did not use this amount as his starting point for determining appellee's lost wages.  Instead, Dr. McCoin testified that the annual salary that he considered was $39,000, which is the amount of income that appellee earned at the time of his accident working for Orion.  Dr. McCoin stated that in order to calculate appellee's potential future earnings with Orion, he added $5,000 in fringe benefits and subtracted social security taxes, federal income taxes, and work costs.  According to Dr. McCoin, the amount left over, "[the amount that appellee] gets to spend" constituted the lost wages if he had continued to work at Orion, which were "about" $739,799.  However, Dr. McCoin pointed out that, in order to calculate appellee's future earnings losses in this case, any potential amount of income appellee earned in the future working somewhere else would be subtracted from this amount.  Dr. McCoin testified that

---

[11] Orion cites evidence in the record that appellee earned approximately $38,000 at Flint.  However, Dr. McCoin stated that he could not agree that this amount reflected appellee's actual income at Flint.  Dr. McCoin opined that appellee's income at Flint was actually $27,000.  Thus, the amount of appellee's income at Flint was a fact issue more suited for a determination by the jury, and we will not disturb its implied finding that Dr. McCoin was correct.

17

in appellee's case, the appropriate amount would be $27,000, the income appellee earned working at Flint, multiplied by 24.8 years of future working years, which totaled "about" $448,881. Thus, according to Dr. McCoin, the total amount of future earnings losses would be $291,219.[12]

Dividing the total amount of $291,219 by 24.8 years equals a yearly average of $11,747 in future lost earnings. Dr. McCoin testified that he had based his estimate that appellee would continue to work for 24.8 years on many factors. However, he also stated that it would be appropriate for the jury "to adjust [the amounts] up and down" based on their review of the evidence. In addition, as the finders of fact, it was well within the jury's province to determine how many years it believed appellee would work in the future based on the evidence presented. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *GTE Mobilnet of S. Tex. Ltd. P'ship*, 61 S.W.3d at 616. If the jury had agreed with Dr. McCoin that appellee would have worked for 24.8 years more, it would have concluded that appellee's lost earning capacity was $291,219. This amount equals approximately $11,747 per year.

Here, however, the jury added $58,681 to the amount of $291,219. Dividing $58,681 by $11,747, the jury must have determined that contrary to Dr. McCoin's testimony, based on among other things, appellee's age at the time of the accident, his family responsibilities, and his prior work ethic, he would have instead worked an additional five more years. Orion has not challenged this implied finding, and as the finders of fact, it was within the jury's province to make such a determination based on

---

[12] Based on our calculation the correct total is $291,318.

the evidence presented. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *GTE Mobilnet of S. Tex. Ltd. P'ship*, 61 S.W.3d at 616.

Moreover, Dr. McCoin testified that his calculation of 24.8 years of future working years had been determined by including periods of not working in the future and as previously stated, Dr. McCoin stated that the jury would need to determine the figures itself. The jury heard appellee testify concerning his desire to work and concerning his work history, including facts that although he had suffered a prior injury, he continued working for Orion and that he worked for Flint even after his 2007 injuries. Thus, the jury could have reasonably determined that appellee would have continued working for more years than Dr. McCoin determined or that appellee would not have had periods of unemployment. *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *GTE Mobilnet of S. Tex. Ltd. P'ship*, 61 S.W.3d at 616 (citing *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d at, 407). Thus, viewing the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable fact finders could and disregarding contrary evidence unless they could not, we cannot conclude that the evidence is legally insufficient to support the amount awarded. *Maritime Overseas Corp.*, 971 S.W.2d at 406; *see also City of Keller*, 168 S.W.3d at 822. And, viewing all of the evidence in favor of, and contrary to, a finding of lost earning capacity damages in the amount of $350,000, *see Maritime Overseas Corp.*, 971 S.W.2d at 406–07, we cannot conclude that the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. We overrule Orion's fifth issue.

## D.     Mental Anguish

By its sixth issue, Orion contends that the evidence is legally and factually insufficient to support the jury's award of damages for past mental anguish and for future

19

mental anguish. Specifically, Orion argues that there is "no evidnece of recoverable mental anguish" or in the alternative, there is "factually insufficient evidence of compensable mental anguish."

1.      Applicable Law

Mental anguish is a "relatively high degree of mental pain and distress. . . . [It is] more than mere disappointment, anger, resentment or embarrassment, although it may include all of these." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). "[M]ental anguish is only compensable if it causes a substantial disruption in daily routine or a high degree of mental pain and distress." *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013) (internal quotation and editorial marks omitted).

To recover mental anguish damages, the requesting party must present evidence of compensable mental anguish and evidence to justify the amount awarded. *Id.* In Texas, recovery of mental anguish damages in virtually all personal injury actions has been authorized. *Johnson v. Methodist Hosp.*, 226 S.W.3d 525, 529 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Krishnan v. Sepulveda*, 916 S.W.2d 478, 481 (Tex. 1995)). "This is because, '[w]here serious bodily injury is inflicted, . . . we know that some degree of physical and mental suffering is the necessary result.'" *Id.* (quoting *City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997)). However, in cases where mental anguish damages are recoverable, the party must present some evidence of the nature, duration, and severity of the mental anguish. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011).

"Mental anguish can be established through witness testimony explaining how the injured party felt and how the injured party's life was disrupted." *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 594 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

However, "[t]here are no magic words to establish mental anguish; rather, courts can look at the totality of the circumstances, as well as the words used." *Id.* Although a jury may not award mental anguish damages simply because the party establishes that a physical injury occurred, the traumatic nature of the injury is a factor that we can consider in determining whether the award of mental anguish damages is supported by the evidence. *Id.* "Damages for future mental anguish are recoverable only if there is a reasonable probability that they will be suffered in the future." *Hicks v. Ricardo*, 834 S.W.2d 587, 590 (Tex. App.—Houston [1st Dist.] 1992, no writ).

2.      Analysis

Appellee testified that he was desperate to do something to help his wife and that "[s]ometimes, [he] would start washing the truck as a therapy, and also just as a distraction." Appellee stated that after his accident, he was desperate to find a job that he could physically do to support his family but that he was unable to find one. Appellee applied for a job at Flint without informing anyone that he had previously been injured because according to him, he would not have been hired and he needed a job to support his family. There was evidence presented that due to appellee's lack of education and skills, the types of jobs he was qualified to do all involved manual labor. Appellee testified that at the time of his accident, his son was only five months old and that he would not have quit his job with Orion if he have been physically able to perform the duties required of him.

Appellee's wife, Blanca Garza De Leon, testified that she and appellee had been married for eleven years and had two children. De Leon stated that the couple had planned to have two more children but that because of appellee's accident they were not able to do so. De Leon testified that when appellee was hired to work at Orion, they were

21

both very excited because he "was making good money, and [they] would have everything" and "were doing fine." De Leon stated that when appellee returned home after the 2007 accident, she was required to help him take off his shoes, "into the bathroom so he could bathe, because [she] could see that he was—he wasn't feeling well." According to De Leon, although Dr. Berliner had recommended that appellee get surgery, it had not happened because the couple did not have any money. De Leon testified that after being unable to work for several years after the accident, appellee finally acquired a job at Flint in "late October or early November 2011." De Leon stated that appellee "arrived from work [at Flint with] his back is [sic] hurting a lot" and that she gives him pills and rubs ointment on him, but appellee then "locks himself in his room." De Leon encourages appellee to go walking in the morning in the park "so he wouldn't be locked inside the house."

De Leon explained that she has noticed that appellee makes much less money working at Flint "because [the coupled does not] have enough to make even half the payments or buying [sic] [their] children what they need for school." When asked how the accident affected appellee, De Leon replied, "So much to the point that he hasn't been able to be the Hector he used to be before. He's not the same. He cannot do the same things he used to do before." Appellee's trial counsel asked De Leon how the accident affected appellee's relationship with his children. De Leon responded:

> It's something that is—we've gone through that is very hard with my children and with me. Like his oldest son, he always tried to be with him to go out with and give him time, and now it's completely different. He stays locked up in his room, because his back hurts. He can no longer go out with my son or with us.
>
> It has affected us so much that we didn't even have enough for my baby's diapers or for my son's school supplies. And I remember when they gave me the list at school, we didn't have money to buy his things. I

22

remember I bought him a notebook and a pencil and he was carrying them in his hand and we went to school seeing that the other children had their backpacks but not my son. It was something that made me feel very bad, most—more for him more—mostly him, because he was a hard-working man who worked to provide everything for us.

Before the accident, his priority was his children, that we weren't—we didn't have any needs at home, and now he feels like he couldn't provide his children what they need or for me neither. And my son who was a few months old, we didn't have enough money to buy him his diapers. I didn't have enough to eat. And I remember that my son, Martin, when he was—when he had his sixth birthday in November, we didn't have enough money for the payments and he told me, "Mom, take some of my money so you can make the payments and you can buy my brother his diapers."

De Leon further testified that due to the stress of not having any income, appellee had been unable to pay for expenses related to her immigration legal matter. De Leon stated that appellee no longer plays with his children and "The way he is now, he's changed a lot. It's affected my relationship with him as well his relationship with his children." When asked on cross-examination by Orion's trial counsel, "And do you blame his back injury for all of that," De Leon replied, "Yes, because I don't have the same Hector I used to before. It's completely different to the one now."

From the above-cited evidence, the jury could have reasonably inferred that appellee's mental anguish caused a substantial disruption in his daily routine or a high degree of mental pain and distress. *See Hancock v*, 400 S.W.3d at 68. Accordingly, viewing the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable fact finders could and disregarding contrary evidence unless they could not, *see Maritime Overseas Corp.*, 971 S.W.2d at 406; *see also City of Keller*, 168 S.W.3d at 822, and looking at the totality of the circumstances as well as the words used by the witnesses, we conclude that there is some evidence to support the jury's award of past and future mental anguish. Thus, the evidence is legally sufficient to support the

23

judgment. Moreover, we cannot conclude that the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. We overrule Orion's sixth issue.

## E. Manifestly Excessive Mental Damages

By its seventh issue, Orion contends that the mental anguish damages are manifestly excessive. Specifically, Orion alleges that because evidence of appellee's mental anguish damages were so slight, the jury's mental anguish damages award constituting 3.75 times the amount of his actual damages is manifestly excessive. Although Orion cites to *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002), as supporting its assertion, Orion neither provides any analysis regarding why the damages are manifestly excessive nor provides any explanation of why under the authority cited the jury's award of mental anguish damages is erroneous. *See* TEX. R. APP. P. 38.1(i). Therefore, as Orion has not met its appellate burden, we overrule its seventh issue.

## V. CONCLUSION

We affirm the trial court's judgment.

**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Delivered and filed this the
5th day of May, 2016.